J. PAUL ENGLAND

*v.*

THE DAILY GAZETTE COMPANY

(No. 10930)

Submitted May 6, 1958. Decided July 3, 1958.

*Charles G. Peters, Robert G. Kelly, Frederick T. Kingdon,* for plaintiff in error.

*Bailey, Worrell & Bailey, R. D. Bailey, James C. Lyons,* for defendant in error.

GIVEN, JUDGE:

In this action of libel, instituted by J. Paul England, in the Circuit Court of Wyoming County, against The Daily Gazette Company, a verdict in favor of plaintiff for Five Thousand Dollars was returned, and a judgment was entered thereon against defendant. The publication containing the words alleged to be libelous was admittedly published by defendant in an editorial appearing in The Charleston Gazette, a newspaper of general circulation throughout West Virginia, on the fifth day of August, 1955. An opinion of this Court in the case of J. Paul Bower against The Daily Gazette Company, involving alleged libelous language contained in the same editorial is reported in 143 W. Va. 719, 104 S. E. 2d 306. The editorial reads: "Using State Insurance to Buy Off Legislators Not in Public Interest

"MORALITY in government was a major issue of the 52nd Legislature, and it had the salutary effect of outlawing liquor accounts as political plums for officeholders.

"Now it's time the Legislature gives state insurance a long, searching study in view of the growing trend toward paying off political debts with fire insurance premiums.

\*      \*      \*

"THE RECIPIENTS of this lush piece of state business deny that they are parties to any wrongdoing. They argue, either out of stupidity or calloused disregard for their public trust, that their dealings with the state are right, proper and aboveboard.

"Perhaps, as they say, their dealings are outwardly legitimate. They get a premium as insurance agents, and the state gets insurance coverage from a reputable company. All would be well if the deal ended there, but by unfortunate circumstance it doesn't end in so innocent and blithe a manner.

"There is a third factor to consider that weighs heavily against these agents. They, as members of the Legislature, hold an allegiance to their constituents which precludes their doing business of any kind with the state while they are in office.

\* \* \*

"IF THEY COULD SERVE their own cause and that of the electorate with equal fervor while holding state insurance contracts, all well and good. But they can't! Their past actions in the Legislature reveal them as peons of the politicians and lackeys of the administration.

"We've watched them at work, and they follow the administration line with dutiful submission. They are the Governor's marionettes on the Senate and House floors, and they jump when ordered to—like Kukla and Ollie of television fame.

"It's easy to see that they've sold their votes—sold out their constituents—for a price. They're more dedicated to their own creature comforts than to the comforts and welfare of the folks back home.

"So that you'll know these legislators better, we'll name them. They, and the amounts of fire insurance premiums awarded them, follow:

"Sen. Jack A. Nuckols, Beckley, $14,500.42; Sen. Don K. Marchand, Morgantown, $6,092.25; Del. Joe Lilly, Oak Hill, $4,307.50; Del. J. Paul England, Pineville, $2,513.92, and Del. Paul Bower, Pineville, $892.50.

"THIS BUSINESS of rewarding the faithful with public funds doesn't end in the Legislature. Kanawha County Political Boss Homer Hanna, Ed Stumpp, Northern Panhandle politician, Wilbur F. Lewis, Huntington politician-insurance agent, and others are paid off for past favors.

"A legislative interim committee investigated the state's insurance policies last year, but took no positive corrective action. We urge that a new look be given the practice, possibly with the view of demanding competitive bids on insurance (contrary to popular opinion, all fire

insurance rates are not the same) or passing legislation compelling self-insurance of state property.

"It's quite obvious that the citizens of West Virginia are being exploited by this amoral practice of doling out insurance to the politically faithful. The public's right of legislative representation is being invaded. The public's insurance protection is perhaps more costly than necessary.

"A change in policy relative to the awarding of insurance is vitally needed, and if the executive department refuses to effect changes voluntarily, the Legislature should step in and make them by statute."

The words contained in the editorial declared on are: "It's easy to see that they've sold their votes—sold out their constituents—for a price. They're more dedicated to their own creature comforts than to the comforts and welfare of the folks back home.

"So that you'll know these legislators better, we'll name them. They, and the amounts of Fire insurance premiums awarded them, follow: Sen. Jack A. Nuckols, Beckley, $14,500.42; Sen. Don K. Marchand, Morgantown, $6,092.25; Del. Joe Lilly, Oak Hill, $4,307.50; Del. J. Paul England, Pineville, $2,513.92, and Del. Paul Bower, Pineville, $892.50".

The defendant entered its plea of not guilty, and filed its special plea and amended special plea, wherein it alleged, in effect, that the publication declared on was published on an occasion privileged, that the matters stated in the publication were true, and that the comment thereon was fair and reasonable, contending that it was the "duty, right and privilege of defendant to publish and comment upon through the news, editorial and political columns of The Charleston Gazette, the acts and conduct of public office holders, and in particular it was and is the duty, right and privilege of defendant to publish and comment upon, through the news, editorial and political columns of The Charleston Gazette, the acts

and conduct of members of the State Legislature, which affect the welfare, interest and rights of the subscribers to and readers of said newspaper and of the citizens and taxpayers of said State". Defendant further alleges, in its pleas, that before the publication of the editorial sued on it "carefully investigated the facts aforesaid and made an honest and diligent effort to ascertain the truth in respect thereto and to truthfully report such facts". Defendant especially denies that the matters complained of were published "falsely or wickedly or maliciously" and further denies that the matters complained of "contained any false, scandalous, libelous, defamatory or malicious words of and concerning the plaintiff". The full editorial is set out in the pleas.

On the day before the publication of the editorial sued on there was published in The Charleston Gazette a news story relating to the allotting of insurance covering State of West Virginia property, against loss by fire, wherein it was said that the insurance "pie was cut in 91 assorted shapes and sizes", naming a large number of individuals and firms to whom insurance was allotted. In the newspaper story it was stated that "J. Paul England, Wyoming County, member of the House of Delegates * * * received insurance worth $2,513.92 in premiums" and that "Del. Paul Bower of Wyoming County, operator of the Bower Insurance Agency, got $892.50 in premiums on $150,000 worth of coverage".

This action was instituted on the eighth day of August, 1955. On the day following the defendant published in The Charleston Gazette an editorial wherein the institution of the action was mentioned and the voting record of plaintiff, as a member of the Legislature, was discussed, and the oath of office required of a member of the Legislature was set out. The editorial stated: "* * * England's complaint, as reported by the Associated Press, was that a Gazette editorial of last Friday said England 'sold out' to the state administration for $2,500 worth of state insurance.

"England said the editorial statement was 'an unprovoked lie'.

"The Gazette, however, is not backing down from any of the statements that appeared in last Friday's lead editorial.

"We said then, and we repeat now . . . a member of the Legislature who accepts profitable patronage from the administration, insurance or otherwise, is joining in an arrangement that is morally wrong.

*　　　*　　　*

"A LEGISLATOR cannot be free to vote only in the interest of his constituents when he knows that upon his favor with the administration depends some profits in his private business . . . in England's case $2,500 worth of insurance premiums."

Evidence before the jury established that plaintiff was a member of the House of Delegates of the State Legislature at the 1953 and 1955 Sessions. He was first nominated as a candidate for the office in the 1952 Primary and was elected thereto at the general election of that year. After he was nominated, but before his election, he was licensed to sell insurance in the State. He was employed, as a part time employee, by the Welch Insurance Agency, at a fixed salary, receiving no compensation for his services other than his salary. The Welch Insurance Agency maintained branch offices, known as the Pineville Insurance Agency, located at Pineville, in Wyoming County. That agency had no separate legal entity. Plaintiff's services to the Welch Insurance Agency, at least in large part, were in connection with the operation of the Pineville offices. Certain insurance policies were issued, through the Department of Purchases of the State of West Virginia, and were allotted to the Welch Insurance Agency, apparently through the Pineville offices, during the time plaintiff was a member of the Legislature. The amounts of the premiums and descriptions of such policies appear not to be materially disputed. They fairly appear in the publications quoted.

The insurance, for the most part, at least, allotted by the State, through the Department of Purchases, related to such losses as might result from fire, and was allotted pursuant to general laws in effect before the commencement of the 1953 Regular Session of the Legislature. The Director of the Department of Purchases is appointed by, and responsible to, the Governor of the State. There appears to be no question that the rates and amounts of premiums on such insurance are so regulated that they are precisely the same regardless of the agency or insurance company to whom the insurance is allotted. The proportion of the premiums allowable to the agencies by the insurance companies seems to be uniformly twenty per cent of the amount of the premiums.

The editorial complained of was written by an employee of defendant, Thomas F. Stafford, "a statehouse, legislative and political writer", but was published with the knowledge and approval of the managing editor and the assistant managing editor "in charge of the editorial page and also political editor" of The Charleston Gazette. Though Stafford was not employed by defendant until December, 1954, the managing editor testified to the effect that he, the managing editor, did not "make any check" of the distribution of insurance as to plaintiff, and as managing editor he "accepted the story prepared by" Stafford, and the assistant managing editor stated that "Stafford did the real leg work on it". While the evidence shows that Stafford had much previous experience in newspaper reporting and that those in charge of the publication of editorials had long considered the so called evil practice, whether such a careful and diligent investigation of plaintiff's connection with the practice before the publication of the charges and imputations was made, would appear to be a question of fact for jury determination.

It is the position of defendant that a long time practice of the executive branch of the State Government existed whereby the votes and influence of members of the State Legislature were obtained in its efforts to

have enacted legislation especially desired by the executive branch of the State Government, by having allotted to such members insurance, or other favors, through the Department of Purchases; that such evil practice was not in the interest of the people, and that it was the duty of defendant to expose such evil practice. For the most part, at least, the conclusions of defendant as to the existence of the evil practice were grounded on an examination of the records in the Department of Purchases made by Stafford. Such records reflect nothing more than the names of the persons to whom insurance was allotted, and the amounts of such insurance. Stafford testified to the effect that he observed the actions of plaintiff at the 1953 and 1955 Sessions of the Legislature, but testified to no action of plaintiff which indicated any such action was the result of improper influence. He also examined certain legislative committee reports, but, admittedly, such reports made no mention of plaintiff or his legislative voting. He also had available the legislative journals, but the only material matter reflected by the journals was the actual voting by plaintiff as to matters before the House. He made no inquiry of plaintiff, or, in so far as the record indicates, of any other member of the House, or of any other person not employed by defendant, as to any improper action of plaintiff.

Defendant states the issues involved on this writ of error to be whether the editorial complained of is a privileged publication; whether malice in a libel action may be inferred from the language of the editorial complained of; whether truth constitutes a complete defense to such an action; whether, in such an action, an editorial published subsequent to the publication of the editorial sued on is admissible in evidence for the purpose of establishing malice; and whether the exclusion of certain evidence was prejudicial error.

Sections 7 and 8 of Article III of our State Constitution provide: "§7. No law abridging the freedom of speech, or of the press, shall be passed; but the Legislature may

by suitable penalties, restrain the publication or sale of obscene books, papers, or pictures, and provide for the punishment of libel, and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation. §8. In prosecutions and civil suits for libel, the truth may be given in evidence; and if it shall appear to the jury, that the matter charged as libelous, is true, and was published with good motives, and for justifiable ends, the verdict shall be for the defendant."

Code, 55-7-2, reads: "All words which, from their usual construction and common acceptation, are construed as insults and tend to violence and breach of the peace, shall be actionable. No demurrer shall preclude a jury from passing thereon."

The litigants apparently agree, and the trial court held, we think correctly, that the editorial complained of was a conditionally or qualifiedly privileged publication. In 53 C. J. S., Libel and Slander, Section 90, it is stated: "In the case of communications qualifiedly privileged, there must be both an occasion of privilege and the use of that occasion in good faith; and whether the privilege is available as a defense may depend on all the circumstances of the particular case." See 12 M. J., Libel and Slander, Section 20.

It appears to be generally agreed by the authorities that a defendant in such an action loses any protection afforded by a qualified privilege if the privilege is abused or exceeded. "The protection of a qualified privilege may be lost by the manner of its exercise, although belief in the truth of the charge exists. The privilege does not protect any unnecessary defamation. In order for a communication to be privileged, the person making it must be careful to go no further than his interests or his duties require. Where the person exceeds his privilege and the communication complained of goes beyond what the occasion demands that he should publish, and is unnecessarily defamatory of plaintiff, he will not be

protected, and the fact that a duty, a common interest, or a confidential relation existed to a limited degree is not a defense, even though he acted in good faith." 53 C. J. S., Libel and Slander, Section 97. In *Rigney* v. *Keesee,* 104 W. Va. 168, 139 S. E. 650, this Court held: "1. In libel, when the defamatory communication is made on an occasion of qualified privilege, the burden of proving malice is cast upon the plaintiff, except where the calumnious language is so violent as to raise an inference of malice." See *City of Mullens* v. *Davidson,* 133 W. Va. 557, 57 S. E. 2d 1, 13 A. L. R. 2d 887; *Parker* v. *Appalachian Electric Power Co.,* 126 W. Va. 666, 30 S. E. 2d 1; *Swearingen* v. *Parkersburg Sentinel Co.,* 125 W. Va. 731, 26 S. E. 2d 209; *Stewart* v. *Riley,* 114 W. Va. 578, 172 S. E. 791; *Barger* v. *Hood,* 87 W. Va. 78, 104 S. E. 280; *Michaelson* v. *Turk,* 79 W. Va. 31, 90 S. E. 395; *Alderson* v. *Kahle,* 73 W. Va. 690, 80 S. E. 1109, 51 L. R. A., N. S., 1198; 33 Am. Jur., Libel and Slander, Section 187; Newell, Slander and Libel, Fourth Edition, Section 485.

In *Swearingen* v. *Parkersburg Sentinel Co., supra,* after having appraised the facts, and after having found that the defendant "did not abuse or exceed the privilege of such occasion", the Court used this language: "Having determined that the occasion was one of qualified privilege and that defendant did not abuse or exceed the privilege, either by vehemence of the published words or extravagant statement, the implication of malice is no longer present and the burden devolves upon plaintiff to prove *malice in fact. Ward* v. *Ward, supra; Rigney* v. *Keesee & Co., supra; Stewart* v. *Riley, supra;* also consult *Chafin* v. *Lynch,* 83 Va. 106, 1 S. E. 803, 809; *Rosenberg* v. *Mason, supra; Montgomery Ward & Co.* v. *Watson,* 55 F. 2d 184."

Usually, though a publication be qualifiedly privileged, where the publisher exceeds or abuses the privilege by false imputation of a crime, the protective characteristics of the privilege are lost. In *Colcord* v. *The Gazette Publishing Co.,* 106 W. Va. 419, 145 S. E. 751, we held: "2. Any printed or written publication falsely imputing

to another a crime or moral delinquency is actionable *per se* without proof of special damages." In the opinion, the Court said: "* * * Any printed or written publication imputing to another a crime or moral delinquency is actionable *per se* without proof of special damages. *Sweney* v. *Baker,* 13 W. Va. 158 * * *". See *Alderson* v. *Kahle,* 73 W. Va. 690, 80 S. E. 1109, 51 L. R. A., N. S., 1198; *Aylor* v. *Gibbs,* 143 Va. 644, 129 S. E. 696; *Payne* v. *Tancil,* 98 Va. 262, 35 S. E. 725; 33 Am. Jur., Libel and Slander, Sections 11, 12; 53 C. J. S., Libel and Slander, Section 53; 12 M. J., Libel and Slander, Section 6. In Newell, Slander and Libel, Fourth Edition, Section 392, it is stated: "Where a person, acting under a sense of duty, makes a communication which he reasonably believes to be true, he must be careful not to be led away by his honest indignation into exaggerated or unwarrantable expressions. The privilege extends to nothing which is not justified by the occasion." The protective features of the qualified privilege may also be lost by imputation of moral delinquency or moral turpitude. "While proper criticism of the conduct or fitness of public officers and candidates for public office is privileged, the privilege does not extend to the imputation of moral delinquency to such persons, and he who attacks their private character, and attributes to them moral turpitude, must stand prepared to prove the truth of his statement under a plea of justification; otherwise, the presumption is that the defamatory language, written or spoken, is false, and will, without more, support a verdict for substantial damages. Criticism and comment upon known or admitted facts are very different things from the assertion of unsubstantiated facts. If the facts upon which the comment is made do not exist, the foundation for the comment fails." 12 M. J., Libel and Slander, Section 20. See Odgers, Libel and Slander, Sixth Edition, Page 289.

The trial court, by reading plaintiff's Instruction No. 1, told the jury, over vigorous objections of defendant, that a "newspaper has a qualified privilege to publish and

comment upon public affairs and public officials, but that in this case the privilege has been abused and exceeded"; that the burden was on "plaintiff to show malice, which implies that the act complained of was conceived in the spirit of mischief, or of criminal indifference to civil obligations"; and that in determining whether malice existed the jury "are entitled to take into consideration whether the language used in the editorial of August 5, 1955 and the editorial of August 9, 1955, threw humiliation at the plaintiff or was arrogant in its charges against him * * *". The questions raised by defendant's objections to the instruction are also raised as to admission of certain evidence, and as to other actions of the trial court. They need not be considered separately.

As above pointed out, the litigants are in agreement as to the publication complained of being qualifiedly privileged. But was the trial court justified in telling the jury that such privilege had been abused? The headlines of the editorial sued on, when read in connection with the naming of plaintiff, fallaciously impute to him improper influence and action in the performance of his duties. A reading of the language of the editorial clearly and unquestionably discloses a charge or imputation, to the effect that, plaintiff "sold" his vote as a member of the Legislature, in effect, a charge that plaintiff accepted a bribe, a crime of audacious and enhanced magnitude, and that in accepting a bribe, plaintiff violated his official oath, also a crime of audacious and enhanced magnitude; that plaintiff betrayed his constituents "for a price"; that he was a "peon of the politicians"; that he was "a lackey" of the administration; that "We've watched" him at work and he was a "marionette" of the Governor; that he "jumped when ordered to—like Kukla and Ollie of television fame"; that he followed "the administration line with dutiful submission"; that "It's quite obvious" that plaintiff has "exploited by this amoral practice of doling out insurance to the politically faithful" taxpayers of the State, and that plaintiff argues out of "stupidity or calloused disregard for" the public trust. The editorial in-

correctly states that "contrary to popular opinion, all fire insurance rates are not the same", a false statement tending to lead directly to the conclusion that taxpayers were being defrauded by the practice alluded to by the payment of excessive insurance premiums. Perhaps any one of such charges or imputations is actionable *per se*, especially in view of the statute quoted above. See *Stewart* v. *Riley*, 114 W. Va. 578, 172 S. E. 791; *Hancock* v. *Mitchell*, 83 W. Va. 156, 98 S. E. 65; *Wilson* v. *Savino*, 10 N. J. 11, 89 A. 2d 399; *Van Lonkhuyzen* v. *Daily News Co.*, 203 Mich. 570, 170 N. W. 93. Considered together, they constitute such a vehement and violent attack on the character of plaintiff as to make an abuse of the qualified privilege clearly apparent. No substantial proof of such charges, other than the proof as to the existence of the evil practice hereinafter discussed, and the voting record of plaintiff, was offered as to such charges or imputations. Such statements constitute direct charges or imputations, not comment. Therefore, the trial court was not in error in holding that the qualified privilege was exceeded.

In *Swearingen* v. *Parkersburg Sentinel Co.*, 125 W. Va. 731, 26 S. E. 2d 209, we held: "3. The existence or nonexistence of a qualifiedly privileged occasion, and whether the privilege has been exceeded, in the absence of a controversy as to facts, are questions of law for the court." See *City of Mullens* v. *Davidson*, 133 W. Va. 557, 57 S. E. 2d 1, 13 A. L. R. 2d 887. These cases, and others cited in this opinion, are clear authority for the proposition that where there exists no controversy as to the facts from which a determination of whether a privileged occasion has been exceeded must be made, that determination is for the court. In the instant case, such determination is made from the language contained in the editorial. The publication, the responsibility for the publication, or the wording thereof, or any material fact in connection therewith, is not in dispute.

Defendant further contends that plaintiff's Instruction No. 1 constituted prejudicial error in submitting

the question of malice to the jury and in telling them that in considering whether malice existed they could consider the language of the editorials of August 5 and August 9. It argues that no evidence exists to support a finding of malice, and that malice can not be inferred from the language of the editorials. We are not unaware of considerable authority to the effect that where a qualified privilege as to a defamatory publication has been exceeded or abused, a plaintiff is relieved as to proof of malice. See *Rigney* v. *Keesee,* 104 W. Va. 168, 139 S. E. 650. Since the trial court submitted the question of the existence of malice to the jury by giving the instruction of plaintiff, and since we are of the view that the evidence warrants the finding made by the jury, we do not consider the other question. In considering whether proof of malice exists in the instant case, it should be observed that malice, in the law of defamation, does not necessarily mean hatred, viciousness or ill will. "It is not necessary, to render an act malicious, that the party be actuated by a feeling of hatred or ill-will toward the individual, or that he entertain and pursue any general bad purpose or design. On the contrary, he may be actuated by a general good purpose, and have a real and sincere design to bring about a reformation of matters; but if in pursuing that design he wilfully inflicts a wrong on others which is not warranted by law, such act is malicious." Newell, Slander and Libel, Fourth Edition, Section 274.

It should also be observed that the publisher of a newspaper has no greater privilege to publish defamatory matter than any other person. The law of defamation applies alike to all. *Swearingen* v. *Parkersburg Sentinel Co.,* 125 W. Va. 731, 26 S. E. 2d 209; *Colcord* v. *The Gazette Publishing Co.,* 106 W. Va. 419, 145 S. E. 751. "7. An editor of a newspaper has no peculiar privilege of publishing, what is injurious to another. He can only publish with impunity that, which any other person would have an equal right to publish in a newspaper." *Sweeney* v. *Baker,* 13 W. Va. 158. See *Snyder* v. *Fatherly,* 158

Va. 335, 163 S. E. 358; 53 C. J. S., Libel and Slander, Section 131; Newell, Slander and Libel, 4th Edition, Section 461.

In *Michaelson* v. *Turk,* 79 W. Va. 31, 90 S. E. 395, this Court held: "3. The jury may presume malice from the use of words made actionable by the statute, but this presumption may be rebutted by proof that no malice was intended." In *Sweeney* v. *Baker,* 13 W. Va. 158, 185, this Court said: "The authorities fully sustain the position, that a publication in a newspaper made either of a public officer or of a candidate seeking an office from the votes of the people, which imputes to him a crime or moral delinquency, is not a privileged publication, either absolute or conditional; but such a publication is *per se* actionable, the law imputing malice to the author or publisher. See *Curtis* v. *Mussey et al.,* 6 Gray 281; *Aldrich* v. *Press Printing Co.,* 9 Minn. 133; *Seeley* v. *Blair, Wright* (Ohio) 358, 683; *Root* v. *King,* 7. Cow. 613; *King* v. *Root,* 4 Wend. 113; *Harwood* v. *Astley,* 1 Bos. & Pul. N. S. 47; *Duncombe* v. *Daniel,* 8 C. & P. 222." See *Swearingen* v. *Parkersburg Sentinel, supra; Stewart* v. *Riley, supra; Rigney* v. *Keesee, supra; Hancock* v. *Mitchell,* 83 W. Va. 156, 98 S. E. 65; *Dillard* v. *Collins,* 25 Gratt. (66 Va.) 343. In *Swindell* v. *Harper,* 51 W. Va. 381, 41 S. E. 117, this Court quoted with approval from 13 Am. Eng. Ency. Law 490, which reads: "Where the subsequent words impute the same crime, or may be fairly considered as equivalent to a renewal or repetition of the same defamatory charge as those already proved, they may be admitted as legitimate evidence of the original malice of the defendant speaker, but not as separate grounds of action where there is no additional count to embrace them". See *Siever* v. *Coffman,* 80 W. Va. 420, 92 S. E. 669; Newell, Slander and Libel, Fourth Edition, Section 291. "Proof that the defamatory statements declared on, or words of similar import had been spoken or written at other times, is admissible to show malice, whether such statements were made before those for which damages are sought or afterwards, even after commencement of

suit." Newell, Slander and Libel, Fourth Edition, Section 287. Also, falsity of the libelous language, and refusal to retract, are circumstances tending to show malice, at least in certain circumstances. 33 Am. Jur., Libel and Slander, Section 267. "Although plaintiff's recovery is necessarily limited to the damages accruing from the libel or slander set forth in his complaint, it appears to be definitely settled that evidence of other defamations published of and concerning him by the defendant either before or after the filing of the suit is admissible for the purpose of showing malice * * *". 33 Am. Jur., Libel and Slander, Section 269.

Defendant relies strongly on *Bailey* v. *Charleston Mail Association,* 126 W. Va. 292, 27 S. E. 2d 837, and *Swearingen* v. *Parkersburg Sentinel Co., supra,* as authority for the proposition that plaintiff failed to establish malice on the part of defendant. In those cases, however, as in a number of others cited, there appears no abuse of the qualified privilege, but as above pointed out, in the instant case the trial court was justified in holding that the qualified privilege had been exceeded.

Though the privileged occasion be admitted, malice be established, and the words sued on be actionable *per se,* plaintiff can not recover if the defendant fairly prove the truth of the defamatory language of the publication, that it was published with good motives, and for justifiable ends. Constitution of West Virginia, Article III, Section 8, quoted above. See *Barger* v. *Hood,* 87 W. Va. 78, 104 S. E. 280; *Siever* v. *Coffman,* 80 W. Va. 420, 92 S. E. 669; *Sweeney* v. *Baker,* 13 W. Va. 158. The only evidence offered by defendant in support of its plea of justification relates to the so called evil practice of the Executive Department of the State Government in alloting insurance, and other business, to members of the State Legislature for the purpose of influencing their votes on desired legislation, and the voting record of plaintiff. In so far as this record discloses, the practice did exist. Plaintiff does not attempt to deny that it existed. Plaintiff, however, does deny that he sold his

vote; that he benefited from any state insurance; or that the alloting of any insurance to his employer, the Welch Insurance Agency, in any manner influenced any vote of his as a member of the Legislature, or that he voted "the administration line with dutiful submission". In his denial, plaintiff is strongly supported by other evidence indicating that he did vigorously oppose certain legislation favored by the administration. While it is true that plaintiff did support and vote for a very great part of the legislation referred to as that favored by the administration, it should not be overlooked or discounted that he belonged to the same political party as the State Executive, and that a very great part of such legislation was not of a controversial nature and was supported by not only the faction of the political party supporting the Executive but by a large part of the opposing faction, as well as by members of the opposing political party, and for the most part by members who were not allotted any insurance. Though the practice of allotting insurance to members of the Legislature may not be justified or defended, the mere proof of the existence of the practice falls far short of establishing that a vote of a member who was allotted insurance business was "sold" or that the member was thereby influenced in his actions as a member of the Legislature. The plaintiff may have voted, and a very great majority of the legislators admittedly did vote for the so called administration legislation minus any insurance business. At least, the facts detailed would require no more than that the question be left to the jury, which was done by defendant's own instructions. The verdict, we think, fairly resolved the question against defendant. We can not say that the allegations of the plea of justification were so clearly and definitely established that the verdict was wrong.

Defendant further contends that the language used in the editorial complained of amounted to no more than fair comment as to matters which it had investigated, believed to be true, and in which it and the public were interested. While it is very generally held that fair

comment as to matters of public affairs is not actionable, where sufficient facts exist on which to ground such comment, it appears to be definitely settled that if such comment is unfair or unreasonably violent or vehement, immunity from liability is denied. "Matters of public interest must be discussed temperately. Wicked and corrupt motives should never be wantonly assigned. And it will be no defense that the writer, at the time he wrote, honestly believed in the truth of the charges he was making, if such charges be made recklessly, unreasonably and without any foundation in fact. Some people are very credulous, especially in politics, and can readily believe any evil of their opponents. There must, therefore, be some foundation in fact for the charges made; the writer must bring to his task some degree of moderation and judgment." Newell, Slander and Libel, Fourth Edition, Section 485.

As above pointed out, however, the charges and imputations contained in the editorial complained of are something very different from mere comment. See *Bailey* v. *Charleston Mail Association, supra; Stewart* v. *Riley, supra; Rigney* v. *Keesee, supra; Kulesza* v. *Chicago Daily News,* 311 Ill. App. 117, 35 N. E. 2d 517, 53 C. J. S., Libel and Slander, Section 130 et seq; 33 Am. Jur., Libel and Slander, Section 161 et seq; Odgers, Libel and Slander, 6th Edition, Page 180; Annotation, 110 A. L. R. 412. Moreover, the jury were told by an instruction of defendant that the defendant was "qualifiedly privileged to use such language, even though harsh and severe, as the facts and circumstances reasonably justify" the same, and that if the jury believed such language was "based on facts which it reasonably believed to be true, that such facts form a reasonable and logical basis for the comments made and the manner in which they were expressed", the verdict should be for the defendant. It seems clear, therefore, that the question was resolved against defendant by the jury.

Defendant further complains as to the action of the trial court in refusing its offer of certain evidence to the

jury, tending to support its pleas of justification and fair comment. Apparently, the evidence was rejected for the reason that it related to matters not known to defendant at the time of publication of the libelous language. A careful examination of such evidence discloses that the only fact it tended to establish which would support any material allegation of such pleas was the existence of the practice of allotting insurance to members of the Legislature. Such evidence does not, in any manner, connect plaintiff with such practice. Since the existence of such practice was considered as established, and not disputed, defendant, in any event, could not have been prejudiced by the exclusion of such evidence. See 1 M. J., Appeal and Error, Section 305.

Finding no prejudicial error, the judgment of the Circuit Court of Wyoming County must be affirmed.

*Affirmed.*