J. Paul Bower

*v.*

The Daily Gazette Company

(No. 10929)

Submitted May 6, 1958. Decided July 3, 1958.

*Charles G. Peters, Jr., Robert G. Kelly, Charles G. Peters, Sr., Frederick T. Kingdon,* for plaintiff in error.

*D. Grove Moler,* for defendant in error.

720

GIVEN, JUDGE:

In this action of libel, instituted by J. Paul Bower, in the Circuit Court of Wyoming County, against The Daily Gazette Company, a verdict in favor of plaintiff for Eight Thousand Dollars was returned, and judgment was entered thereon against defendant. The publication containing the words alleged to be libelous is the same editorial on which the libel action of J. Paul England against The Daily Gazette Company was founded. The opinion of this Court in that case is reported in 143 W. Va. 700, 104 S. E. 2d 306. The facts in the two cases are substantially to the same effect, and need not be detailed here. Principles of law adjudicated in that case are applicable to the facts in the instant case.

The declaration alleges that defendant, "contriving and maliciously intending to injure him in his said good name, fame, credit and morals and to bring him into public scandal, infamy and disgrace * * * and to injure him in his business and his office * * * falsely, wickedly and maliciously did compose, publish, and print of and concerning him * * * that is to say: 'It's easy to see that they've (referring to plaintiff as one of several members of the West Virginia Legislature who served in said 1955 session) sold their votes—sold out their constituents —for a price', meaning thereby to allege that plaintiff, who is specifically named in the same newspaper on said date together with other members of the West Virginia Legislature, did unlawfully, dishonestly and fraudulently barter, trade and sell to some one or more persons for valuable consideration and personal gain and profit, his right and privilege of voting honestly and to the best of his judgment and ability for the best interests or the wishes of his fellow citizens of Wyoming County and of West Virginia, and was bribed or induced by offers of personal gain and monetary profit by some person or persons to deliberately, wilfully, dishonestly, fraudulently and in bad conscience, and in total disregard of his said duty to his fellow citizens of Wyoming County and the State of West Virginia, vote on matters in the Legis-

lature contrary to their best interests and contrary to his honest convictions, knowledge and judgment concerning said best interests and the wishes of said fellow citizens —in effect, an allegation that plaintiff was guilty of the disgraceful and unlawful act of accepting a bribe * * *". The declaration sets out the following portion of the editorial: "Using State Insurance To Buy Off Legislators Not In Public Interest . . . It's easy to see that they've sold their votes—sold out their constituents— for a price. They're more dedicated to their own creature comforts than to the comforts and welfare of the folks back home. So that you'll know these legislators better, we'll name them. They, and the amounts of fire insurance premiums awarded them, follow: Sen. Jack A. Nuckols, Beckley, $14,500.42; Sen. Don. K. Marchand, Morgantown, $6,092.25; Del. Joe Lilly, Oak Hill, $4,307.50; Del. J. Paul England, Pineville, $2,513.92, and Del. Paul Bower, Pineville, $892.50." The names of the five legislators are printed in the editorial in bold type.

The defendant entered its plea of not guilty and filed its special plea and amended special plea alleging, in effect, justification of the matters published and that the same constituted fair and reasonable comment as to matters of public affairs.

Plaintiff, since about 1946, has operated the Bower Insurance Agency, in Mullens, Wyoming County, being the sole owner thereof. He was first elected as a member of the House of Delegates of the West Virginia Legislature in 1952, and served through the 1953 and 1955 Sessions. He was allotted certain state insurance in 1951. He was subsequently allotted other state insurance and in January, 1955, the total amount of premiums on state insurance held by him was $1,806.36. At the time of the publication of the editorial complained of, such total was $1,596.09. At the time of the allotting of state insurance, on which the news story of August 4, 1955 was based, concerning the allotting of state insurance, he was granted no new insurance business, but renewals of policies previously held by him were granted, total premiums of which amounted to

$892.50, twenty per cent of which he was entitled to as commissions. He testified to the effect, and he is in no way contradicted, that he never solicited such insurance except that as to the insurance allotted to him in 1951, the matter of insurance was mentioned by him to the Clerk of the State Senate, not an officer of the Executive Branch of the Government, and that no person ever made mention or suggestion as to his vote or influence in the Legislature in connection with state insurance or other business, and that no vote or action of his was so influenced. The Speaker of the House of Delegates, the majority floor leader of the House, and other members thereof, testified to the effect that they considered plaintiff independent in his voting and actions as a member of the House, and not a "lackey" of the Executive or a "marionette" of the Governor. Stafford, the employee of defendant who wrote the editorial complained of, apparently conducted the only actual investigation of the facts on which the editorial was attempted to be based, the nature and extent of which investigation were fully considered in the opinion in the *England* case. Though Stafford was not an employee of defendant until December, 1954, the editor of The Daily Gazette accepted his "verdicts usually without exception on anything pertaining to state government", and the assistant editor's "knowledge is secondary, from Mr. Stafford".

It is pointed out that plaintiff's Instruction No. 1, after telling the jury that the burden of proving malice was on plaintiff, further instructed them that malice "may be inferred from the language used in the editorial complained of", while in the *England* case the jury were told, in a similar instruction, that they could "consider" such language in determining whether malice existed. We think that the different wording of the instruction, as applied to the facts in the instant case, did not constitute prejudicial error. The authorities cited in the *England* case fully support the proposition that where a privileged occasion exists and has been clearly abused or exceeded

by the publisher, that malice, within the meaning of the law of defamation, may be by the jury inferred from the language used.

It is also pointed out that while the record in the *England* case was such as to warrant the conclusion that plaintiff therein received no part of any premium paid to the insurance agency by which he was employed, the record in the instant case establishes that plaintiff was the sole owner of the agency to which the premiums, and the commissions thereon, were paid. While the difference is material, we think the materiality thereof is not such as to require a different result, in the circumstances of this case. By defendant's own instruction, No. 6, not objected to by plaintiff, the jury were told that "there can be no recovery of damages in this case without proof of actual malice on the part of the defendant", and "Therefore, unless the jury believe from a preponderance of the evidence that the defendant, in publishing the words complained of, acted with malice, ill will or improper motive toward the plaintiff, you should return a verdict for the defendant". The jury having found against defendant, and there being sufficient evidence to support the finding, the verdict should not be disturbed.

As in the *England* case, the instant case was tried, we think properly, on the theory that the publication complained of was qualifiedly privileged, it being pointed out that the publisher of a newspaper is charged with a high duty of publishing matters pertaining to public affairs, and especially as to improper actions of public officers. The high duty is not doubted. The high duty, however, is correlative with a high responsibility not to maliciously and untruthfully defame an individual citizen, and not to unfairly and unreasonably comment on such actions, though in certain types of cases, not involved here, absolute privilege, and immunity from civil liability, are accorded a publisher. The Founders believed it necessary, and did, make provisions guaranteeing freedom of the press. They also believed it necessary to, and did, make

provision "for the recovery, in civil actions, by the aggrieved party, of suitable damages" for libel. Sections 7 and 8 of Article III of the State Constitution, quoted in the *England* case, when read together, clearly require certain restraints as to defamatory publications, and the arrangement of such provisions seems to imply that self restraints are to be preferred. In *Sweeney* v. *Baker*, 13 W. Va. 158, 182, this Court, Judge Green writing, said: "The terms 'freedom of the press' and 'liberty of the press' have misled some to suppose, that the proprietors, of a newspaper had a right to publish that with impunity, for the publication of which others would have been held responsible. But the proper signification of these phrases is, if so understood, misapprehended. The 'liberty of the press' consists in a right, in the conductor of a newspaper, to print whatever he chooses without any previous license, but subject to be held responsible therefor to exactly the same extent, that any one else would be responsible for the publication", and, at page 191, "If the newspaper press was allowed to be licentious, the result would be, to drive from the control of newspapers all men of character, and to deter from seeking office all but the profligate and abandoned. Nor would the result be different, if a belief in the facts, on which such false and libelous allegations were based, was held to be a legal excuse for publications of this character against such candidates. To justify such a publication, it must be proven that the allegation is true in fact."

Finding no prejudicial error, the judgment of the Circuit Court of Wyoming County must be affirmed.

*Affirmed.*