**David J. RICE, Plaintiff,**

v.

**ROSE & ATKINSON, et al., Defendants.**

No. CIV.A. 2:00–0943.

United States District Court,
S.D. West Virginia,
Charleston Division.

Dec. 13, 2001.

Jeffrey T. Jones, Law Offices of Jeffrey T. Jones, Charleston, WV, for Plaintiff.

John M. Slack, III, Stephen R. Crislip, Jill M. Obenchain, Jackson & Kelly, Charleston, WV, for Defendants.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is Defendants' motion for summary judgment on all issues. For reasons discussed below, the motion is **GRANTED**.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Dr. David J. Rice and the Community Health Association, d/b/a Jackson General Hospital (Hospital) entered into a five-year written employment agreement, which began on July 1, 1996, and which was to end on July 1, 2001. In September of 1997, a nurse working at the Hospital complained to Hospital CEO Richard Rohaley that Rice had pushed a medical cart into her, bruising her leg. Shortly thereafter, Rohaley called Rice into his office and presented him with a letter dated September 23, 1997 terminating his employment. The letter alleged mistreatment of female hospital employees constituting hostile environment sexual harassment, violation of federal laws by refusing to treat a patient in the emergency room, and other acts and omissions in violation of the employment agreement and the employee handbook.

Rice took the letter from Rohaley and put it in his pocket. The Hospital did not report any reason for Rice's termination to the National Practitioners Data Bank. The Hospital's policy was not to provide any opinion of employees in response to inquiries, but to report only days of employment. Rohaley did report Rice's termination at the Hospital medical staff and executive committee meetings, explaining Rice had created a hostile work environment.[1] Through his counsel Rose and At-

---

**1.** Rohaley's reports to the medical staff and executive committee were developed in dis-
covery in this action, and not presented to the Court in the underlying action.

kinson (R & A), Rice brought a civil action against the Hospital alleging defamation and breach of contract.

The Court granted summary judgment to the Hospital on Rice's defamation claim, finding no evidence the allegedly defamatory statements contained in the Hospital's letter discharging Rice had been published. *See Rice v. Community Health Ass'n,* No. 6:97–1169 (S.D.W.Va. October 13, 1998)(order granting partial summary judgment). The Court also held West Virginia law did not support Rice's claim for compelled self-publication. *Id.* Rice's remaining breach of contract claim was tried to a jury December 15 to 17, 1998. The jury found the Hospital wrongfully terminated Rice in violation of the employment agreement, and that the termination was malicious so as to preclude any required mitigation of damages. The jury awarded Rice the full amount requested for direct breach of contract damages, $751,564.00, as well as $1,418,829.00 for future consequential damages.

On appeal, the Fourth Circuit upheld the breach of contract award. *See Rice v. Community Health Ass'n,* 203 F.3d 283, 286 (4th Cir.2000). Regarding future consequential damages, however, the Court of Appeals predicted that an award of consequential damages could be maintained under West Virginia law, but held that Rice failed to present the necessary evidence of loss of identifiable professional opportunities required to support such a claim. *Id.* On remand and after discovery on Rice's consequential damages claim under the standard enunciated by the appeals court,[2] this Court granted summary judgment to the Hospital, finding Rice failed to produce evidence of non-fabricated lost job opportunities. *See Rice v. Community Health Ass'n,* 118 F.Supp.2d 697, 704 (S.D.W.Va. 2000).

Rice then brought this action for legal malpractice against his former counsel, both the law firm of Rose & Atkinson and individually named attorneys (collectively R & A). Rice alleged Defendants failed (1) to investigate his case and present evidence sufficient to survive summary judgment on his defamation claim, (2) to encourage him to self-publish the defamation, (3) to present evidence of damage to reputation, and (4) to request a jury instruction on pre-judgment interest. Finally, Rice alleged (5) R & A had a conflict of interest based on a fee referral agreement with the law firm of Steptoe & Johnson. Following discovery, R & A moved for summary judgment on all counts. Briefing is complete and the matter is ripe for disposition.

## II. DISCUSSION

### A. *Summary Judgment Standard*

Our Court of Appeals has often stated the settled standard and shifting burdens governing the disposition of a motion for summary judgment:

> Rule 56(c) requires that the district court enter judgment against a party who, "after adequate time for ... discovery fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." To prevail on a motion for summary judgment, the [movant] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. In determining whether a genuine issue of material fact has been raised, we must construe all inferences in favor of the [nonmovant]. If, however, "the evidence is so one-sided that one party must prevail as a matter of law," we must affirm the grant of summary

---

**2.** During this process, Rice's former counsel R & A was replaced by his current counsel.

judgment in that party's favor. The [nonmovant] "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." To survive [the motion], the [nonmovant] may not rest on [his] pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue. As the *Anderson* Court explained, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff[.]" *Harleysville Mut. Ins. Co. v. Packer,* 60 F.3d 1116, 1119–20 (4th Cir.1995) (citations omitted); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994); *see also Cabro Foods, Inc. v. Wells Fargo Armored Serv. Corp.,* 962 F.Supp. 75, 77 (S.D.W.Va.1997); *Spradling v. Blackburn,* 919 F.Supp. 969, 974 (S.D.W.Va.1996).

"At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried. If not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly." *Thompson Everett, Inc. v. National Cable Adver., L.P.* 57 F.3d 1317, 1323 (4th Cir.1995). It is through this analytical prism the Court evaluates the parties' motions.

### B. Legal Malpractice

■ The West Virginia test for actionable legal malpractice was stated in *Keister v. Talbott,* 182 W.Va. 745, 748–49, 391 S.E.2d 895, 898–99 (1990): " 'In a suit against an attorney for negligence, the plaintiff must prove three things in order to recover: (1) the attorney's employment; (2) his neglect of a reasonable duty; and (3) that such negligence resulted in and was the proximate cause of loss to the client.' " *Id.* (quoting *Maryland Casualty Co. v. Price,* 231 F. 397, 401 (4th Cir.1916))(other citations omitted). In undertaking professional services for a client, an attorney is required "to exercise the knowledge, skill, and ability ordinarily possessed and exercised by members of the legal profession in similar circumstances." *Id.* at 748, 391 S.E.2d at 898.

■ As the *Keister* court further explained: "Proof of the attorney's negligence alone is insufficient to warrant recovery; it must also appear that the client's damages are the direct and proximate result of such negligence." *Id.* at 749, 391 S.E.2d at 899 (citing *Stewart v. Hall,* 770 F.2d 1267 (4th Cir.1985)(other citations omitted)). Damages are calculated on the basis of the value of the claim lost or judgment suffered by the alleged negligent attorney. *Stewart,* 770 F.2d at 1269. "Thus, in making the determination that an attorney's negligence proximately caused a client's damages, the trier of the malpractice action must find that the result in the underlying action would have been different *but for* the attorney's negligent performance". *Id.* (citation omitted)(emphasis added). Further, "damages arising from the negligence of an attorney are not presumed, and the plaintiff in the malpractice action has the burden of proving both his loss and its causal connection to the attorney's negligence." *Keister,* 182 W.Va. at 749, 391 S.E.2d at 899.

With these principles in mind, the Court examines Rice's claims of legal malpractice.

### 1. Failure to Investigate Defamation Publication or Encourage Self-publication

■ Rice alleges that during discovery in the underlying action he provided his counsel R & A with the names of nine individuals who could testify to publication of the allegedly defamatory statements in his termination letter, but his counsel

failed to investigate, to interview the individuals, or otherwise to produce evidence to prove publication. Because R & A did not undertake the necessary investigation, Rice argues, the Hospital's motion for summary judgment on defamation was granted.[3] R & A responds that even after extensive investigation in this action, Rice has failed to demonstrate a single instance of nonprivileged publication. Additionally, R & A argues their decision to terminate their investigation without interviewing every potential witness was a tactical decision and reasonable as a matter of law. The Court agrees on both points.

### a. Unprivileged communications by Hospital

■ Of the people Rice identified as individuals to whom the Hospital published the allegedly defamatory reasons for his firing, seven either never heard any connection between the firing and sexual harassment or heard Rice was terminated, but could not recall the source of the "rumor" about why, the "hearsay" about sexual harassment.[4] Only Carolyn Fichtner testified that a Hospital employee, a nurse or perhaps a clerk who worked in the emergency room, said something to the effect Rice was having an affair with a nurse and was let go for sexual harassment.

■ An employer may be liable for injury caused by the tortious conduct of its employee if the employee was an agent acting within the scope of employment, in accordance with the expressed or implied authority of the employer. *Courtless v. Jolliffe*, 203 W.Va. 258, 262, 507 S.E.2d 136, 140 (1998). A corporation is not liable for libel published by its agent unless the agent was authorized to make the publication or his acts subsequently were ratified by the corporation. *Miller*, 197 W.Va. at 411, 475 S.E.2d at 503 (citing *Barger v. Hood*, 87 W.Va. 78, 83, 104 S.E. 280, 282 (1920)). Rice has provided no evidence the Hospital authorized the unknown nurse or clerk to make statements about Rice's purported affair and firing for sexual harassment, nor that the Hospital ever ratified such statements.

### b. Privileged communications by the Hospital

The last alleged recipient of defamatory statements on Rice's list is Dr. Moradi, who testified that Rohaley and Dr. Kyle, President of the Hospital, informed the medical staff during a staff meeting that Rice was "basically fired because of sexual harassment." (Defs.' Mem. in Supp. of Summ. J., Ex. EE at 7.) Discovery during this action also revealed two other doctors who recalled being told about Rice's termination during hospital meetings. Dr. Snyder said he was told in a medical staff meeting that Rice was accused of "some sort of sexual harassment or something in terms of pushing a cart at one of the nurses."[5] (*Id.*, Ex. KK at 7.) Dr. James

---

3. The essential elements for a successful common law defamation action by a private individual are (1) defamatory statements, (2) a nonprivileged communication to a third party, (3) falsity, (4) reference to the plaintiff, (5) at least negligence on the part of the publisher, and (6) resulting injury. Syl. pt. 6, *Miller v. City Hosp., Inc.*, 197 W.Va. 403, 411, 475 S.E.2d 495, 503 (1996)(citing Syl. pt. 1, *Crump v. Beckley Newspapers*, 173 W.Va. 699, 320 S.E.2d 70 (1983)).

4. Paul Schindler, James T. Hughes, Jackie McGrady, and Cindy Reese heard Rice was fired, but not in connection with sexual harassment, while Dr. A. Al–Mahayri and Kimberly Winder could not recall a source. (Defs.' Mem. in Supp. of Summ. J. at 3.) Ashley Barnette heard there was a charge of sexual harassment, but the information did not come from anyone at the Hospital. *Id.*

5. Of the sixteen doctors present at the medical staff meeting, eight selected by Rice were

Hughes also testified he was informed of the reasons for Rice's firing at an executive committee meeting. (Pl.'s Mem. in Resp., Ex. AA at 12, 13).

 Assuming that Rohaley and/or Kyle informed the medical staff and the executive committee that Rice was fired based on sexual harassment, nevertheless, these statements would not constitute defamation because they were privileged.[6]

 West Virginia recognizes that communications arising by common interest in the subject matter are qualifiedly privileged. *See Rigney v. W.R. Keesee & Co.*, 104 W.Va. 168, 171, 139 S.E. 650, 652 (1927) (citations omitted). Qualified privilege may also arise through duty to communicate or in a confidential relation. *England v. Daily Gazette Co.*, 143 W.Va. 700, 710, 104 S.E.2d 306, 312 (1958). The question of privilege is for the court. *Rigney* at 171, 139 S.E. at 652. The privilege does not, however, protect any unnecessary defamation. The privilege is qualified in that the speaker must "be careful to go no further than his interests or his duties require." *England*, 143 W.Va. at 709, 104 S.E.2d at 312.

Both the medical staff and executive committee meetings of the Hospital are appropriate forums for official business, including confidential employment actions by the Hospital. Every doctor deposed

acknowledged and understood the Hospital policy that discussions at the medical staff meetings were confidential and not to be disseminated. (Defs.' Mem. in Supp. of Summ. J., Ex. NN.) Both the medical staff and the executive committee had a legitimate need to know about the termination of a contract physician before the end of the contract, and the reasons given for the action. Disciplinary personnel actions taken toward a medical staff member require explanation and justification so that the governance of the Hospital can be understood to follow appropriate procedures in application of its bylaws and employment agreements. The Hospital, through its agents Rohaley and/or Kyle, had a reasonably perceived duty to communicate the information to both official groups.

 Rice argues that Rohaley's statements in these official meetings were not privileged because they exceeded the necessary bounds. Once a conditional privilege is established, it can be overcome only by a showing of *New York Times* malice, that is, "actual malice." *DeLeon v. St. Joseph Hosp., Inc.*, 871 F.2d 1229, 1238 (4th Cir.1989)(referring to *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and finding qualified privilege where a surgeon denied admitting privileges brought a defamation action for official statements made

---

deposed, but only two, Moradi and Snyder, recalled any such discussion.

**6.** Rice argues the defense of qualified privilege is not available to R & A because it is an affirmative defense, which they failed to assert and thus waived. (Pl.'s Mem. in Resp. at 3 (citing *Nellas v. Loucas*, 156 W.Va. 77, 191 S.E.2d 160 (1972)).) As Plaintiff correctly characterizes the difference between affirmative and general defenses, "a general defense negates an element of plaintiff's prima facie case, while an affirmative defense excuses the defendant's conduct even if the plaintiff is able to establish a prima facie case." (*Id.* at

4.) As explained above, however, an element of defamation is "a nonprivileged communication to a third party." *See Miller*, 197 W.Va. at 411, 475 S.E.2d at 503. The defense of privileged communication is, thus, a general defense to defamation.

More significantly, as Defendants note, the defense of privilege belongs to the Hospital, defendant in the defamation action, and the opposing party in the underlying action to Defendants here. R & A hardly could be required to have asserted the Hospital's defense of privilege in order to demonstrate now that the privilege applied to Rohaley's communications.

to the hospital board and committees). Demonstration of such malice requires showing the speaker knew his statements were false or acted with reckless disregard as to their truth.[7] *Id.* A further exception to qualified privilege exists where "the calumnious language is so violent as to raise an inference of malice." *England,* 143 W.Va. at 710, 104 S.E.2d at 312.

According to Rice, Rohaley knew there was no evidence Rice sexually harassed female employees at the Hospital and thus knew his statements were false. Rohaley, however, testified he developed the termination letter in conjunction with and reliance on Hospital counsel Fred Holroyd. The incident that precipitated the termination was Rice's conduct in angrily shoving a cart so it hit and bruised a nurse. Relying on legal counsel, Rohaley's understanding was that creating a "hostile work environment" was correctly characterized as a form of sexual harassment. (Defs.' Mot. for Summ. J., Ex. Q, 42–43.) He testified that at the medical staff meeting he would not have used the term " 'sexual harassment' because that's not why [Rice was fired.] You know, to me sexual harassment means a lot different than hostile work environment. Nothing—nothing with any sexual content whatsoever was ever discussed." (*Id.,* Ex. HH at 19–20.)

■ To lie is to state as truth what one knows to be false. Rice has produced no evidence Rohaley knew one thing but reported another to the medical staff or the executive committee. At best, the evidence shows Rohaley was unclear about the relation between hostile environment and sexual harassment. His qualified privilege to speak was not defeated by a choice of words suggested by the Hospital's lawyer.

■ Regarding defamation, the dispositive question for this Court is whether, but for R & A's alleged negligence in failing to investigate publication, the outcome of the underlying action would have been different. *Stewart,* 770 F.2d at 1269. At summary judgment stage, the issue is whether Rice has raised questions of material fact sufficient to send this issue to a jury. He has not. Even if R & A had investigated every lead proposed by Rice or uncovered in discovery conducted in this action, the result would have been the same at summary judgment stage in the underlying action: summary judgment for the Hospital based on no nonprivileged publication.

This result is not simply the kindly disposition of fate, that no evidence that might have been discovered was uncovered. Instead, after limited investigation, R & A made a tactical decision not to pursue the defamation investigation, based on hearing negative information about Rice, including his unwanted advances toward female employees, performing allegedly unnecessary pelvic examinations on

---

7. Rice argues the jury's finding the Hospital acted with malice in terminating Rice so as to preclude requiring Rice to mitigate his damages defeats the qualified privilege. In a wrongful termination/breach of contract case, the employee's duty to mitigate damages is overcome by a showing the employers willfully and deliberately violated the employee's rights under circumstances where it knew or should have known of the employee's rights. *See Mason Co. Bd. of Educ. v. State Superintendent of Schools,* 170 W.Va. 632, 637–38, 295 S.E.2d 719, 725 (1982).

As Rice's counsel, R & A sought the jury instruction supporting this finding to enable Rice to collect an award of the full remaining amount on his contract. No evidence, however, links the Hospital's malice in terminating Rice with Rohaley's statements to the medical staff or the executive committee, statements that the jury could not have considered in that regard because they were not offered in evidence at trial.

**594**

female patients, and nurses who said they would call off if they were scheduled to work with him.

█ Rice counters that there were identifiable witnesses ready to gainsay such negative information. The issue is not, however, the ultimate truth of the allegations by a preponderance of the evidence, but whether it was a reasonable strategic decision not to put on a defamation action carrying the potential to undermine the contract action. To prove defamation, Rice would have had to prove the falsity of the Hospital's reasons, in particular sexual harassment, and demonstrate damage to his reputation. Both would open the door to character evidence about Rice.[8] The negative reports about Rice obtainable from patients and co-workers could have infected his successful breach of contract case. Inevitably, had the jury heard both the defamation and contract actions, it would have heard every negative report about Dr. Rice, his alleged bad acts and reputation, all providing potential good cause to terminate his contract. The professional legal decision to allow the defamation claim to expire at summary judgment strengthened the contract claim, which was ultimately successful.

### c. Self-publication

█ Finally, Rice alleges R & A dissuaded Rice "from acts that would have led to compelled self-publication of the aforesaid defamatory statements." (Compl.¶ 16.) This Court previously rejected Plaintiff's theory of defamation through compelled self-publication as a matter of law. *See Rice v. Community Health Ass'n*, No. 6:97–1169, 6 (S.D.W.Va. Oct. 13, 1998). Thus R & A's putative dissuasion was irrelevant to any determination of the issue in the underlying case.

Accordingly, the Court **GRANTS** summary judgment to R & A on the issue of failure to discover, investigate, put forward, or create evidence on Rice's defamation claim in the underlying action.

### 2. Evidence of Damage to Reputation

█ At trial Rice presented the expert testimony of two emergency room physicians, Drs. Hoekstra and Lander, who opined that a physician fired for sexual harassment would not be able to get a job as an emergency room physician. On appeal, the Fourth Circuit rejected the jury's consequential damage award, finding Rice had presented evidence of damage to reputation rather than the required loss of professional opportunities. *See Rice v. Community. Health Ass'n*, 203 F.3d at 289–90.

Rice here alleges:

25. Since there was no longer a defamation count in the Complaint, plaintiff could not keep his reputation damages.

26. Defendants, and each of them, were negligent, reckless and careless in failing to present evidence of damages to reputation that were sufficient to keep the Court from dismissing the defamation count of the Complaint in response to defendant's motion for summary judgment.

(Compl.¶¶ 25, 26.) As discussed at length above, however, the defamation count was dismissed for lack of proof of the element of publication. Proof of damage to reputation was irrelevant to the summary judgment determination. Accordingly, the Court GRANTS summary judgment to R & A on the issue of failure to present evidence of reputation damage.

---

**8.** "In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct." Fed.R.Evid. 405(b).

### 3. Pre-judgment Interest

■ The jury awarded $751,564.00 for breach of contract damages and $1,418,829.00 in future consequential damages. Post-trial, Plaintiff, through counsel R & A, moved to amend the Judgment Order to reflect prejudgment interest on both amounts, citing *W. Va.Code* § 56–6–31, which begins, "Except where it is otherwise provided by law, every judgment or decree for the payment of money entered by any court of this State shall bear interest from the date thereof...." The Court held, however, that interest in contract actions was otherwise provided by law, *W. Va.Code* § 56–6–27, which entitles a claimant to a jury instruction that interest may be allowed, but does not provide for mandatory prejudgment interest. *See Rice v. Community Health Ass'n*, 40 F.Supp.2d 788, 800 (S.D.W.Va.1999).

Rice alleges that because R & A failed to request a jury instruction on prejudgment interest, he lost that amount. The issue is whether but for R & A's acknowledged omission, the result would have been different. The applicable statute provides in pertinent part, "The jury, in any action founded on contract, *may allow interest* on the principal due, or any part thereof[.]" W. Va.Code § 56–6–27 (emphasis added). Had the jury been instructed that prejudgment interest *may* be allowed on all or part of the principal due, it might or might not have awarded such interest.

Rice requested the Court's permission to contact jurors to ask a single question, "If you had been instructed that Dr. Rice was entitled to receive pre-judgment interest, would you have awarded it to him?"[9] *Rice v. Community Health Ass'n*, No. 2:00–0943, 2 (S.D.W.Va. Aug. 1, 2001)(order denying motion to contact jurors).

The motion was denied because the proposal "invites jurors to speculate about possible alternative deliberations in a trial held more than two and a half years ago," as well as "asking individual jurors to speculate about what each of them might now decide, separate and apart from the input and reactions of the remaining jurors, had the jury been instructed differently on a technical point concerning damages." *Id.* at 3. Speculation, the Court observed, is excludable by *Rule* 401 because it has no tendency to make the existence of any material fact more or less probable than it would be without that evidence. *See id.* (citing Fed.R.Evid. 401).

Rice would now ask a new jury to speculate about what the first jury might have done had it been informed it had discretion to add interest to its judgment. Under the Court's ruling, no evidence is forthcoming as to what the jury might have awarded had it been told it might award interest. Accordingly, Rice does not raise an issue of material fact with regard to this issue, and the Court **GRANTS** R & A's motion for summary judgment on prejudgment interest.

### 4. Conflict of Interest

■ Finally, Rice alleges R & A entered into a referral fee agreement with the law firm of Steptoe & Johnson (Steptoe). The insurance companies providing insurance coverage for the Hospital on the defamation claims, according to the Complaint, were represented by Steptoe, producing an apparent conflict of interest.

R & A responds Rice's counsel Mark Atkinson's undisputed testimony is that R & A sent Charlie Johns, a Steptoe attorney, $2500 from the fee R & A collected from Rice because Johns had recom-

---

**9.** The Court notes Rice's proposed question did not state the issue entirely fairly as Rice

was not "entitled" to interest, but the jury had discretion to award it.

mended R & A to a Pittsburgh firm, which recommendation led Rice to call R & A. (Defs.' Mem. in Supp. of Summ. J. at 17, n. 11.) The payment was not made pursuant to any formal or informal agreement, and R & A did not consult with Johns or any Steptoe attorney concerning any substantive decisions in Rice's case. *Id.* Under *Rule* 1.5 of the *Rules of Professional Conduct,* lawyers who are not in the same firm may divide a fee if the division is proportional to the services performed by each lawyer, the client is advised of and does not object to the participation of the lawyers involved, and the total fee is reasonable. Model Rules of Prof'l Conduct R. 1.5(e). Atkinson consulted with Rice before giving the money to Johns and Rice told Atkinson he didn't have a problem with it, that it was Atkinson's money. (Mem. in Supp. at 17, n. 11.)

Rice provides no response to R & A's characterization and explanation of the referral fee arrangement. In particular, Rice points to no evidence that R & A had any interest in or provided any representation to the Hospital's insurers. Accordingly, the Court **GRANTS** summary judgment to R & A on the issue of conflict of interest.

## III. CONCLUSION

Having considered Plaintiff's presentation discussed above and his other arguments, which the Court finds to be without merit, R & A's motion for summary judgment on all issues is **GRANTED.** By Judgment Order entered today this case is dismissed and stricken from the Court's docket.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record by facsimile transmission and first-class mail and publish it on the Court's website at http://www .wvsd.usc-ourts.gov.

### *JUDGMENT ORDER*

In accordance with the Memorandum Opinion and Order entered this day, the Court **GRANTS** judgment in favor of Defendants and **ORDERS** the case be **DISMISSED** with prejudice and **STRICKEN** from the docket.

The Clerk is directed to send a copy of this Judgment Order to counsel of record.