328 S.E.2d 675 (1985)
Betty J. MUTAFIS
v.
ERIE INSURANCE EXCHANGE, etc., and Erie Insurance Company, etc.
No. CC943.
Supreme Court of Appeals of West Virginia.
March 28, 1985.
*677 David J. Romano and James N. Riley, Young, Morgan, Cann & Romano, Clarksburg, for appellee.
James R. Watson, Steptoe & Johnson, Charleston, for defendant.
*676 NEELY, Chief Justice:
During the summer of 1979 there were numerous thefts and arsons of cars in and around Clarksburg. On 27 May 1979, Betty J. Mutafis reported to her insurer, Erie Insurance Exchange, that her car had been stolen. Richard Kimble, an adjuster for Erie, investigated the claim; soon after the car was stolen, it was found stripped and burned. Erie then paid Mrs. Mutafis in accordance with her insurance policy.
Three weeks later Vincent Oliverio reported the theft of his car to Erie and Richard Kimble was also assigned to investigate that theft. There was significant delay in paying Mr. Oliverio for his loss. When Mr. Oliverio asked about the delay, Mr. Kimble told him that Erie was "investigating your involvement" with the reported theft. The Oliverio vehicle was then found stripped and burned and when Mr. Kimble could not substantiate any involvement in the theft by Mr. Oliverio, Erie paid the claim.
Mr. Oliverio, however, indignant over his treatment by Mr. Kimble, sued Erie on the grounds that Mr. Kimble had libeled and slandered him, uttered "insulting words" and engaged in improper conduct in handling his claim. During the course of the suit by Mr. Oliverio against Erie, Mr. Oliverio discovered a 7 August 1979 confidential memorandum prepared by Mr. Kimble's supervisor, Glenn W. LaQue. This memorandum came to light as a result of pre-trial discovery in the Oliverio case, and it was the following postscript to that memorandum that provided the gravamen of Betty Mutafis' claim against Erie:
Please reference for your information to file # W017415, this is a relative and associated with mafia very heavily, although may have NO connection whatever.
Mr. Oliverio's counsel asked for claim file # W017415 and it turned out that the file related to Betty J. Mutafis' claim.
In March, 1981, during the trial of the Oliverio case, the 7 August memorandum was introduced into evidence, although counsel for Erie prevented disclosure of the name of Mr. Oliverio's relative. Nonetheless, despite the sealing of the court records, Mrs. Mutafis read a Clarksburg newspaper account of the trial and, being aware that she was an insured of Erie who was also a relative of Mr. Oliverio, deduced that the reference was to her. Then, after the Oliverio trial concluded, Mr. Oliverio told Mrs. Mutafis that the 7 August memorandum did, indeed, refer to her file.
*678 Mrs. Mutafis consulted a lawyer and he wrote to Erie asking for an explanation of the unfavorable statements contained in his client's file. Two weeks later, having received no response or apology from Erie, Mrs. Mutafis filed suit in the United States District Court against Erie alleging five theories of liability: (1) intentional infliction of severe emotional distress; (2) libel and slander; (3) insulting words; (4) improper insurance claims handling; and, (5) breach of a fiduciary relationship between insurer and insured. The case was tried in the United States District Court for the Northern District of West Virginia where the jury returned a verdict of $15,000 in compensatory damages and $20,000 in punitive damages in favor of Mrs. Mutafis and against Erie on the theory that Erie violated W.Va.Code, 33-11-4(3) or (5) [1974]the West Virginia Unfair Trade Practices Act. Chief Judge Charles H. Haden II, of the District Court wrote a memorandum opinion and order, Mutafis v. Erie Insurance Exchange, 561 F.Supp. 192 (1983), and that opinion is reprinted here as appendix A to this opinion.
For reasons that will become apparent upon reading the District Court's opinion, the trial progressed in such a way that Mrs. Mutafis was allowed to go to the jury only on her theory of violation of the Unfair Trade Practices Act, although as Judge Haden indicates in his opinion, if her lawyers had proceeded in a different manner she might well have prevailed on her libel theory.
The district court decision was appealed to the United States Circuit Court of Appeals for the Fourth Circuit and by Order dated 2 July 1984 the Chief Judge of the United States Circuit Court certified three questions to this Court concerning the law of West Virginia, to wit:
1. If the facts stated in part I of this opinion are true, were the actions of Erie, its agents, servants, and employees in violation of § 33-11-4(3) and (5), or either of them?
2. If question 1 is answered in the affirmative, does West Virginia law permit a private cause of action by plaintiff against Erie?
3. If questions 1 and 2 are answered in the affirmative, is the common law defense of qualified privilege an available defense to the action?
The opinion of the United States Court of Appeals, 728 F.2d 672, to which the certified questions refer is, again, published here as Appendix B.

I
Before answering the certified questions, it is important to point out that we must assume the findings of fact of the district court are correct. We are not sitting as an appellate court; rather, pursuant to W.Va. Code, 51-1A-1 [1976] we are simply asked to answer questions of law. In this regard, the cynosure of the District Court's opinion is found in § IV, (The Jury's Verdict Was Supported by the Evidence) where the District Judge says:
Erie's argument that the jury verdict was not supported by the evidence can be disposed of by an analysis of the testimony given by two employees of Erie. The two principals involved in preparing and drafting the August 7, 1979, memorandum were Richard Kimble, a claims adjuster who had worked on both the Oliverio and the Mutafis claims, and Wayne LaQue, an appraiser for Erie who was also Kimble's supervisor. Their sworn testimony at trial, standing alone, reveals ample evidence to support the jury's verdict for the Plaintiff.
Richard Kimble testified on direct examination (called by the Plaintiff as an adverse witness) that he did not write the August 7, 1979, memorandum, but that he did supply some of the information contained in it. Kimble stated that the memorandum itself was written by LaQue. The witness testified that he did not supply any information to LaQue linking the Plaintiff with the Mafia. Kimble said that he did not know where that information came from, and further testified that he did not have, nor did he have at the time of trial, any information *679 to cause him to believe that the Plaintiff was associated with the Mafia.
Wayne LaQue (also called as an adverse witness by the Plaintiff) admitted writing the memorandum and stated that it was directed to a Mr. Chaffee, who was head of Erie's audit department, the division charged with investigating claims which appear "suspicious". At first, LaQue testified that all of the information in the memorandum, including the erroneous information concerning the Plaintiff's involvement in the Mafia, was supplied to him by Kimble. The witness later testified that he could not remember if Kimble had used those exact words, that is, that the Plaintiff was "heavily involved in the Mafia" and then testified that he could not remember if Kimble had actually told him that the Plaintiff was in the Mafia.
LaQue further testified that the statement relating to the Plaintiff's alleged involvement in the Mafia was prompted by the "bad area" involved in the theft of Plaintiff's car. When questioned by the Court as to what he meant by "bad area" LaQue stated that it related to that area of Clarksburg where the car was found after it had been stripped and burned. A few minutes later, however, on redirect examination, the witness stated that "bad area" referred not to where the car was found, but to the section of Clarksburg in which the Plaintiff resided. Upon further questioning LaQue then admitted that he did not know where in Clarksburg the Plaintiff resided.
This testimony not only creates rather obvious credibility problems, but collectively, Kimble's and LaQue's testimony unequivocally demonstrate that the two employees responsible for the production of the memorandum, by their own admission, had no basis whatsoever for stating that the Plaintiff was connected in any way with the Mafia. As a result, there was sufficient evidence to support the jury's finding that Erie's employees placed in the Plaintiff's file information which they knew to be false. LaQue's and Kimble's testimony also support the jury's finding (via the award of punitive damages) that Erie's employees acted intentionally, recklessly and willfully in placing the memorandum in the Plaintiff's file.

II
The first and the third certified questions, namely whether the defendant's actions are in violation of W.Va.Code, 33-11-4(3) and (5) [1974], and whether the common law defense of qualified privilege is available if there was a violation are related and we shall answer those two questions together.
W.Va.Code, 33-11-4(3) and (5) [1974], provide as follows:
(3) Defamation.No person shall make, publish, disseminate, or circulate, directly or indirectly, or aid, abet or encourage the making, publishing, disseminating or circulating of any oral or written statement or any pamphlet, circular, article or literature which is false, or maliciously critical of or derogatory to the financial condition of any person and which is calculated to injure such person.
(5) False statements and entries.
(a) No person shall knowingly file with any supervisory or other public official, or knowingly make, publish, disseminate, circulate or deliver to any person, or place before the public, or knowingly cause directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false material statement of fact as to the financial condition of a person.
(b) No person shall knowingly make any false entry of a material fact in any book, report or statement of any person or knowingly omit to make a true entry of any material fact pertaining to the business of such person in any book, report or statement of such person.
Subsection (3) of W.Va.Code, 33-11-4 [1974] prohibits the dissemination of false or maliciously critical statements. Certainly it is maliciously critical of and *680 derogatory to a person's financial condition to assert that she is closely associated with the mafia. Similarly, Erie violated W.Va. Code, 33-11-4(5) [1974], which prohibits the insertion of false material about a person's financial condition in a private business file or publication of such material to the public. The mere publication of false material about a person's financial condition under W.Va.Code, 33-11-4(3) [1974] or the insertion of false material concerning the financial condition of a person into a company file under W.Va.Code, 33-11-4(5) [1974], however, does not give rise to a cause of action under W.Va.Code, 33-11-4(3) and (5) [1974], if any of the common law privileges that arose in the development of traditional libel and slander law applies, and it is to that subject that we now turn.

III
We believe that the resolution of the privilege question in the case before us is controlled by our reasoning in the case of Mauck v. City of Martinsburg, W.Va., 280 S.E.2d 216 (1981). Mauck involved a similar question, namely whether the common law defenses of privilege, developed in the decisional law of libel and slander, apply to the statutory cause of action for insulting words, W.Va.Code, 55-7-2 [1923]. In syllabus point 3 of that case we set the policy that we hold applies to the case before us now:
In an action for insulting words under W.Va.Code, 55-7-2 [1923], where the alleged words are uttered for the truth of the matter asserted there is a defense of qualified privilege completely coextensive with the defense of qualified privilege which existed heretofore in actions for defamation at common law; thus when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to persons who have a legitimate interest in the subject matter, the writing or speech is privileged.
Although W.Va.Code, 33-11-4(3) and (5) [1974] would appear to establish absolute liability whenever a false statement about the financial condition of a person is published generally or placed in a file, we do not believe that it was the intention of the legislature to so circumscribe necessary business communication as to establish absolute liability without fault. Furthermore, as we indicated in Mauck, a statute like W.Va.Code, 33-11-4(3) and (5) [1974] can raise serious First Amendment issues that are best handled by placing the statute within the well developed common law of libel and slander. The ancient body of well-developed defamation law establishes hierarchies of interests that are protected and accommodates both free speech on the one hand and victims' rights on the other. We do not, however, decide this case on First Amendment grounds; rather, we hold that the legislature had the law of defamation firmly in mind when it created the causes of action under W.Va. Code, 33-11-4(3) and (5) [1974] and intended they be interpreted with the common law defamation privileges as necessary qualifications to the statutes.
However, inasmuch as Mr. LaQue testified in the district court that his statement about Mrs. Mutafis' connection with the Mafia was prompted by the "bad area" involved in the theft of the plaintiff's car, and then that the "bad area" related not to the area of the theft, but rather to the area where Mrs. Mutafis lived, and then that he did not know where Mrs. Mutafis lived, we conclude that the memorandum in question was written with such willful, wanton, and reckless disregard of its truth or falsity that no recognized privilege under West Virginia law applies to it. Sprouse v. Clay Communications, Inc., 158 W.Va. 427, 211 S.E.2d 674 (1975), cert. denied, 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975); reh'g denied, 423 U.S. 991, 96 S.Ct. 406, 46 L.Ed.2d 311 (1975). In fact, Mr. LaQue's testimony unequivocally demonstrates that the two employees responsible for the production of the memorandum, by their own admission, had no basis whatsoever for stating that the plaintiff was connected in any way with the Mafia. As a result, there *681 was sufficient evidence to support the jury's finding that Erie's employees placed in the plaintiff's file information that they knew to be false. There is, of course, no privilege known to the common law of defamation protecting the intentional publication of false material.

IV
Finally, we must address the federal circuit court's second certified question, namely whether a private cause of action exists to enforce the Unfair Trade Practices Act. In Syllabus Point 1 of Hurley v. Allied Chemical Corp., W.Va., 262 S.E.2d 757 (1980) we set forth the guidelines for determining whether violation of a statute gives rise to a private cause of action. That syllabus point provides:
The following is the appropriate test to determine when a State statute gives rise by implication to a private cause of action: (1) the plaintiff must be a member of the class for whose benefit the statute was enacted; (2) consideration must be given to legislative intent, express or implied, to determine whether a private cause of action was intended; (3) an analysis must be made of whether a private cause of action is consistent with the underlying purposes of the legislative scheme; and (4) such private cause of action must not intrude into an area delegated exclusively to the federal government.
In Jenkins v. J.C. Penney Casualty Ins. Co., W.Va., 280 S.E.2d 252 (1981) we already held in Syllabus Point 2 that there is an implied private cause of action for a violation by an insurance company of subsection (9) of W.Va.Code, 33-11-4 [1974]. Certainly there is no less reason to allow a private cause of action under subsections (3) and (5) of W.Va.Code, 33-11-4 [1974] than there is under subsection (9) of the same statute.
The test of Hurley is met in the case before us because Mrs. Mutafis was a member of the class of persons whose financial reputation was sought to be protected by the statute; the legislature obviously intended that the statute have some meaning, and it is hard to conceive how it would be enforced in the absence of a private cause of action; there is no reason to believe that a private cause of action is in any regard inconsistent with the underlying purposes of the legislative scheme; and, the federal government has nothing whatsoever to do with this area of state law. There is no reason here to repeat the exhaustive reasoning and citations to authority in our opinion in Jenkins, and therefore, we answer the Federal Court's second question affirmatively and hold that there is a private cause of action for a violation of W.Va.Code, 33-11-4(3) and (5) [1974].
Certified questions answered.

APPENDIX A

Betty J. MUTAFIS, Plaintiff,

v.

ERIE INSURANCE EXCHANGE, et al., Defendants.

Civ. A. No. 81-0044-C(H).

United States District Court, N.D. West Virginia, Clarksburg Division.

March 25, 1983.

MEMORANDUM OPINION AND ORDER
HADEN, Chief Judge.

I. Background
The Plaintiff, Betty J. Mutafis, a former policyholder of the Erie Insurance Exchange (Erie), brought this action[1] against the Defendant corporations alleging intentional infliction of emotional distress, libel, slander and breaches of the West Virginia Insulting Words Statute[2] and Unfair Trade *682 Practices Act.[3] The conduct complained of occurred during Erie's investigation of the insurance claims filed by the Plaintiff and her cousin, Vincent J. Oliverio, both of whom had had a car stolen in 1979. Both cars were later found "stripped" of valuable accessories and burned. During the course of this investigation, one of Erie's appraisers inserted in Plaintiff's file and cross-referenced to Oliverio's file, a memorandum stating that the Plaintiff was "heavily involved in the Mafia"[4]. At the conclusion of the two-day trial the jury returned a verdict for the Plaintiff on the Unfair Trade Practices Act count and awarded compensatory damages of $15,000 and punitive damages of $20,000. The case is presently before the Court on Erie's motions for a new trial, for judgment notwithstanding the verdict, and for a remittitur.
In support of its motions Erie challenges the jury verdict on the following grounds: (1) Erie's memorandum was protected under the First Amendment; (2) no private cause of action exists under W.Va.Code, § 33-11-4(3) or (5); (3) there was insufficient evidence to support the jury verdict; (4) the Plaintiff suffered no actual damages; (5) the jury's award of punitive damages was improper; (6) the Plaintiff did not prove that the Defendants' conduct constituted a "general business practice"; and (7) the Unfair Trade Practices Act was applied retroactively. The Court will address these arguments in seriatum.

II. Erie's Memorandum Was Not Protected By The First Amendment

Erie argues that the Supreme Court has recognized that commercial speech is entitled to First Amendment protection and that, therefore, the memorandum at issue in this action must be scrutinized in accord with constitutional standards protecting freedom of speech. Specifically, the Defendant contends that the standards set forth in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) apply and that any recovery by the Plaintiff should have been predicated upon a finding by the jury that the Defendant acted "maliciously" and that the Plaintiff suffered actual damages. New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (requirement of malice); Gertz v. Robert Welch, Inc., 418 U.S. 323, 325, 94 S.Ct. 2997, 3000, 41 L.Ed.2d 789 (1974) (requirement of actual damages). In support of this argument Erie states that there was no issue of malice to present to the jury because the Court found as a matter of law, by granting the Defendant's motion for a directed verdict as to the Plaintiff's libel and slander causes of action, that Erie had not acted maliciously.
While the Supreme Court's decision in Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) does extend First Amendment protection to certain types of commercial speech, the remainder of Erie's argument does not survive scrutiny for several reasons. First, the Defendant's entire argument has as its cornerstone the contention that the Court concluded as a matter of law that Erie's employees had not acted maliciously. As the following discussion explains, the Court made no such ruling concerning the absence of a malicious motivation on behalf of Erie.
The Court did remove from the jury's consideration, on Erie's motion for a directed verdict, the Plaintiff's libel and slander causes of action. Because the communication remained entirely intra-corporate, the Court concluded as a matter of law that there had been no publication of the memorandum and that lacking this essential element the Plaintiff could not proceed on her libel and slander theories. See Mauck v. City of Martinsburg, 280 S.E.2d 216 (W.Va. 1981). As a second reason for granting Erie's motion for a directed verdict on these *683 counts, the Court held that even if there was a publication of the memorandum, there attached to that communication a qualified privilege. Because there was no controversy concerning the circulation of the memorandum the Court ruled as a matter of law[5] that, inasmuch as the memorandum had been "published" only to those employees of the company who had a legitimate interest in the contents of the document, the qualified privilege had not been abused or exceeded.[6]
From this ruling the Defendant infers a sub silentio finding by the Court that the employees of Erie had not acted maliciously. This inference is grounded on the principle that a qualified privilege can be abused by a person acting out of malice, as well as by over-publication. The Court acknowledges this as a correct statement of West Virginia law. Mauck v. City of Martinsburg, 280 S.E.2d 216, 221 (W.Va.1981). The infirmity of Erie's analysis lies in the fact that though the Court did specifically rule that a qualified privilege was applicable *684 and also specifically ruled that it had not been abused by over-publication, the Court did not rule that the privilege was not abused by malice.
If the Court had simply made a general ruling, without explanation, that the conditional privilege had not been exceeded, then an argument could be made that such a ruling logically and necessarily implies two things: (1) the privilege was not abused by over-publication; and (2) the publisher did not act with malice. However, as noted above, the Court ruled only on the question of whether the memorandum was published to anyone not having a legitimate interest in it. The issue of whether Erie's employees acted with malice and thereby violated the conditional privilege was not mentioned or presented by either counsel during the arguments on the Defendant's motion for a directed verdict. Therefore, the issue of malicious motivation was not before the Court, was not considered by the Court, and accordingly, was not ruled upon by the Court in granting the Defendant's motion for a directed verdict on the Plaintiff's libel and slander causes of action. Because implicit in Erie's analysis is the contention that there was an alternate theory the Court could have relied upon to deny Erie's motion for a directed verdict on the Plaintiff's libel and slander causes of action (i.e., malicious motivation), Erie's contention here is, at best, an argument that the Court erred in favor of Erie in withdrawing the libel and slander counts from the jury's consideration.[7]
Secondly, Erie's contention that the memorandum involved here constitutes "commercial speech" protected by the First Amendment and that such communication may not serve as a basis for a defamation-type action unless the New York Times v. Sullivan standard is met finds no support in the case law or the facts of this case.
First National Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); Virginia Board of Pharmacy v. Virginia Consumer Council, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); Bigelow v. Virginia, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1970), the cases cited by the Defendant in support of the argument that the First Amendment standards apply, are inapposite. Those cases involve state statutes restricting a commercial entity's ability to disseminate information to the public.[8]
*685 Because there is absolutely no indication in any of these cases that constitutional standards of free speech would extend so far as to embrace entirely intra-corporate communications such as the one giving rise to this action, the Court must reject Erie's contention that the August 7, 1979, memorandum is protected under the First Amendment.
The final reason for rejecting Erie's argument on this point is that, assuming for the sake of argument that constitutional standards were applicable here, the standard by which Erie's conduct was measured did meet the First Amendment standards the Defendant urges the Court to adopt. As noted above, Erie would have the Court apply the standard of liability set forth in New York Times v. Sullivan, which requires liability to be predicated upon a finding that the Defendant acted with "actual malice". The Supreme Court defined the "actual malice" necessary to make a statement actionable as one made "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-80, 84 S.Ct. at 725-26.[9] At the trial of this action the jury was instructed that liability was dependent upon a finding that the Defendant knowingly made a false material statement concerning the Plaintiff. Thus, the Sullivan standard that the statement be made with "knowledge that it was false" was incorporated in the Court's charge to the jury. The jury's verdict for *686 the Plaintiff indicates a finding by that body that Erie made a knowingly false statement in placing the memorandum in Plaintiff's file. Therefore, the Defendant's conduct was measured by a standard sufficient to establish liability even if the communication was protected commercial speech under the First Amendment.
For the reasons just discussed, the Court rejects Erie's argument that the Plaintiff's recovery in this action violated the First Amendment's guarantee of Freedom of Speech.
III. A Private Cause Of Action Exists Under W.Va.Code, § 33-11-4(3) and (5)
While Erie concedes, as it must, that the West Virginia Supreme Court in Jenkins v. J.C. Penney Casualty Insurance Company, 280 S.E.2d 252 (W.Va.1981) recognized that a violation of W.Va.Code, § 33-11-4(9) gives rise to a private cause of action, the Defendant contends that no such cause of action exists under W.Va.Code, § 33-11-4(3) or (5), the subsections on which the Plaintiff's verdict was based. These subsections provide:
"(3) No person shall make, publish, disseminate, or circulate, directly or indirectly, or aid, abet, or encourage the making, publishing, disseminating or circulating of any oral or written statement or any pamphlet, circular, article or literature which is false, or maliciously critical of or derogatory to the financial condition of any person and which is calculated to injure such person.
(5)(a) No person shall knowingly file with any supervisory or other public official, or knowingly make, publish, disseminate, circulate or deliver to any person, or place before the public, or knowingly cause directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false material statement of fact as to the financial condition of a person.
(b) No person shall knowingly make any false entry of a material fact in any book, report or statement of any person or knowingly omit to make a true entry of any material fact pertaining to the business of such person in any book, report or statement of such person."
Before turning to the relevant factors to be considered in determining whether subsections 4(3) and 4(5) support private actions for redress, the Court deems it beneficial to point out that the West Virginia Supreme Court of Appeals has noted its predisposition to recognize implied causes of action. The court stated in Jenkins, "This Court's past acceptance of an implied cause of action for a statutory violation is deeply engrained." 280 S.E.2d at 255. The court went on to point out that West Virginia is perhaps the only jurisdiction to allow a private tort action for violation of a statute requiring sidewalks to be kept in good repair. Id. Therefore, in attempting to determine whether the West Virginia courts would permit a private cause of action under subsections 4(3) and 4(5)[10] this Court will do so with a recognition that the West Virginia Supreme Court has demonstrated a willingness to allow statutorily implied causes of action.
The controlling authority in West Virginia on the recognition of implied causes of action is Hurley v. Allied Chemical Corporation, 262 S.E.2d 757 (W.Va.1980). Hurley set forth four factors for courts to consider in making the determination of whether a violation of a statute gives rise to a private action.[11] Because the court in Jenkins analyzed *687 the same statute, albeit a different subsection, as the one involved here, this Court will review the Hurley factors by retracing the analytic steps taken by the Court in Jenkins.
The first factor to be considered is whether the Plaintiff is a member of the class for whose protection the statute was enacted. The Court will not tarry upon a point that is so obvious as to be beyond serious dispute: an insured, such as the Plaintiff, is most certainly a person within the class intended to be protected by a statute regulating trade practices in the insurance industry. This elementary point is implicit throughout the West Virginia Supreme Court's opinion in Jenkins.[12]
Hurley next requires the Court "to determine whether from the act itself or from its legislative history a private cause of action was intended." 280 S.E.2d at 257. Because this factor focuses upon the Act itself rather than on any particular section, the discussion of this factor in Jenkins is dispositive. In Jenkins the court determined that, "[w]hile there is no legislative history, the strong policy declaration in our statute against unfair insurance practices initially suggest the appropriateness of a private cause of action." 280 S.E.2d at 257. The court went on to discuss, and finally rejected, the proposition that that section of the Act which provides an administrative remedy may be contra-indicative of a private cause of action.[13] This Court shares the view expressed in Jenkins that the Act's strong policy statement militates in favor of recognizing a private cause of action under the statute.
When considering the third factor set forth in Hurley, whether a private cause of action is consistent with the underlying purpose of the legislative act, the court in Jenkins considered the particular subsection of the Unfair Trade Practices Act, upon which Jenkins relied. In discussing the unfair settlement practices subsection of the Act, the court held that allowing a private cause of action under that subsection was consistent with the underlying legislative purpose and that permitting a person to recover damages resulting from a violation of that subsection would act as a deterrent against further violations of the Act. 280 S.E.2d at 258. Those statements are equally applicable to the subsections involved here, each of which makes it unlawful for an insurance company to knowingly place false information in an insured's file. Allowing a person to recover damages in a private action for injuries resulting from a violation of subsections 4(3) and 4(5) is perfectly consistent with a legislative scheme designed to prevent an insurance company from knowingly making false statements about its insureds. The potential for liability and tort created by recognizing a private cause of action under these subsections would likewise achieve the deterrent effect spoken of by the court in Jenkins and would thus be an effective tool in securing compliance with the Act.
The last factor to be considered is whether the State statute-based cause of action will intrude into an area exclusively delegated to the federal government. As noted by the Court in Jenkins, there is no potential conflict with federal law in this area since the Congress has specifically relegated the regulation of insurance to the states.[14]
*688 In view of the fact that the West Virginia Supreme Court of Appeals has already recognized a private cause of action under one of the subsections of the Unfair Trade Practices Act and inasmuch as each of the above discussed Hurley factors argue in favor of allowing a private cause of action under the subsections relied upon in this action, the Court concludes that private causes of action exist under W.Va.Code, § 33-11-4(3) and (5). Accordingly, the Court committed no error at trial in allowing the Plaintiff to proceed, and recover, on these theories.

IV. The Jury's Verdict Was Supported By The Evidence

Erie's argument that the jury verdict was not supported by the evidence can be disposed of by an analysis of the testimony given by two employees of Erie. The two principals involved in preparing and drafting the August 7, 1979, memorandum were Richard Kimble, a claims adjuster who had worked on both the Oliverio and the Mutafis claims, and Wayne LaQue, an appraiser for Erie who was also Kimble's supervisor. Their sworn testimony at trial, standing alone, reveals ample evidence to support the jury's verdict for the Plaintiff.
Richard Kimble testified on direct examination (called by the Plaintiff as an adverse witness) that he did not write the August 7, 1979, memorandum, but that he did supply some of the information contained in it. Kimble stated that the memorandum itself was written by LaQue. The witness testified that he did not supply any information to LaQue linking the Plaintiff with the Mafia. Kimble said that he did not know where that information came from, and further testified that he did not have, nor did he have at the time of trial, any information to cause him to believe that the Plaintiff was associated with the Mafia.
Wayne LaQue (also called as an adverse witness by the Plaintiff) admitted writing the memorandum and stated that it was directed to a Mr. Chaffee, who was head of Erie's audit department, the division charged with investigating claims which appear "suspicious". At first, LaQue testified that all of the information in the memorandum, including the erroneous information concerning the Plaintiff's involvement in the Mafia, was supplied to him by Kimble. The witness later testified that he could not remember if Kimble had used those exact words, that is, that the Plaintiff was "heavily involved in the Mafia" and then testified that he could not remember if Kimble had actually told him that the Plaintiff was in the Mafia.
LaQue further testified that the statement relating to the Plaintiff's alleged involvement in the Mafia was prompted by the "bad area" involved in the theft of Plaintiff's car. When questioned by the Court as to what he meant by "bad area" LaQue stated that it related to that area of Clarksburg where the car was found after it had been stripped and burned. A few minutes later, however, on redirect examination, the witness stated that "bad area" referred not to where the car was found, but to the section of Clarksburg in which the Plaintiff resided. Upon further questioning LaQue then admitted that he did not know where in Clarksburg the Plaintiff resided.
This testimony not only creates rather obvious credibility problems, but collectively, Kimble's and LaQue's testimony unequivocally demonstrate that the two employees responsible for the production of the memorandum, by their own admission, had no basis whatsoever for stating that the Plaintiff was connected in any way with the Mafia. As a result, there was sufficient evidence to support the jury's finding that Erie's employees placed in the Plaintiff's file information which they knew to be false. LaQue's and Kimble's testimony also support the jury's finding (via the award of punitive damages) that Erie's employees acted intentionally, recklessly and willfully in placing the memorandum in the Plaintiff's *689 file.[15] Indeed, the testimony adduced at trial and summarized above compels such a finding; the evidence commends no other inference save the one drawn by the jury. The jury's verdict being entirely consistent with the evidence presented at trial, the Defendant's motion to set aside the jury verdict on the grounds that it is unsupported by the evidence is devoid of merit.[16]Accord, Cicinato v. McPheeters, 542 F.2d 634 (4th Cir.1976); Harner v. McShain, Inc., 394 F.2d 480 (4th Cir.1968); Mays v. Pioneer Lumber Corporation, 502 F.2d 106 (4th Cir.1974).
In a different vein Erie argues that the jury verdict was unsupported by the evidence inasmuch as subsections 4(3) and 4(5)(a) speak only of false statements which are derogatory to the "financial condition" of a person and subsection 4(5)(b) relates only to false statements concerning the "business" of such person. The Defendant argues that the only false statement involved here, that the Plaintiff was heavily involved in the Mafia, could not be interpreted to relate to the Plaintiff's "financial condition" or "business" and, therefore, the August 7, 1979, memorandum could not be actionable under W.Va.Code, § 33-11-4(3), (5)(a) or (5)(b).
Perhaps the most effective and concise response to this argument that the memorandum could not be interpreted in such a fashion would be simply "but the jury found otherwise". The jury was properly instructed on the elements of the statute, including the provisions requiring that the statement be made in reference to the Plaintiff's financial condition or business. It was within the province of the jury to determine what inferences could be reasonably drawn from the statement contained in the memorandum that the Plaintiff was "heavily involved in the Mafia." The jury's verdict obviously reflects that body's considered judgment that the language used in the memorandum impugned the Plaintiff's financial condition and business. The Court cannot say as a matter of law that this construction is invalid or is not supported by the evidence. See Cicinato v. McPheeters, supra; Harner v. McShain, Inc., supra; Mays v. Pioneer Lumber Corporation, supra. The jury could properly consider all the implicit ramifications contained in a statement linking an individual with such an infamous criminal organization. The jury could well have found that the memorandum was perjorative not only of the Plaintiff's financial condition and business, but to her moral, social and ethical integrity as well. Subsection 4(3) and 4(5) must be read to embrace a cause of action not only for those false statements made in direct and specific reference to an insured's financial condition or business, but also those false statements which a jury may infer necessarily relate to the insured's commercial enterprise or financial status. Any other construction of the statute would permit insurance companies to easily avoid liability under the Act simply by couching their derogatory remarks in ambiguous phrases which nevertheless convey the same meaning, and cause the same injury, as statements specifically referring to the insured's business or financial condition. The Court concludes that the jury's finding that the memorandum impeached the Plaintiff's financial condition and business is supported by the evidence, the memorandum *690 itself, and the inferences which the jury could reasonably draw therefrom.

V. The Plaintiff Suffered Actual Damages

It is also apparent that Erie's argument that the Plaintiff suffered no actual damages lacks merit. Recovery for emotional distress unaccompanied by physical injury is proper in cases involving an intentional tort. Harless v. First National Bank of Fairmont, 289 S.E.2d 692 (W.Va. 1982); Sprouse v. Clay Communications, 211 S.E.2d 674 (W.Va.1975); Prince v. The Pittston Co., 63 F.R.D. 28 (S.D.W.Va.1974); Monteleone Co. v. Co-Operative Transit Company, 128 W.Va. 340, 36 S.E.2d 475 (1945).[17] The Plaintiff's uncontradicted testimony established the anguish, embarrassment, shame, anger and depression which she suffered as a result of Erie's conduct. The evaluation of Plaintiff's emotional distress was a quintessential jury issue. The jury's award of $15,000 compensatory damages for Plaintiff's injuries certainly was not "monstrous and enormous, at first blush beyond all measure, unreasonable and outrageous, and such as manifestly shows jury passion, partiality, prejudice, or corruption", Addair v. Magestic Petroleum Co., Inc., 232 S.E.2d 821, 825 (W.Va.1977), and therefore, must remain undisturbed.

VI. The Jury's Award Of Punitive Damages Was Proper

Erie challenges the award of punitive damages because of the "constitutional ramifications involving an award of punitive damages in an area affecting protected commercial speech." This argument is mooted by the Court's conclusion, already explained, that the memorandum in question was not protected speech under the First Amendment.
Erie also argues that no punitive damages should be allowed in actions under the Unfair Trade Practices Act because Section 33-11-6[18] permits the Commissioner of Insurance to impose sanctions and, therefore, there is no need for punitive damages in order to discourage violations of the Act.
This argument ignores Section 6(c) which clearly states that: "[n]o order of the commissioner pursuant to this article or order of court to enforce it, or holding of a hearing, shall in any manner relieve or absolve any person affected by such order or hearing from any other liability, penalty or forfeiture under law." (Emphasis added). In view of such an unambiguous legislative pronouncement, there can be no serious contention that the provisions of Section 33-11-6 bar a recovery of punitive damages by a private plaintiff. Moreover, in discussing the damages recoverable in an action seeking redress for a violation of Section 33-11-4(9) the court in Jenkins stated that punitive damages may be recovered in an appropriate action. 280 S.E.2d at 259, n. 12. Inasmuch as subsection 4(9) and the subsections involved here are indistinguishable for purposes of the present discussion, the *691 Court finds the Supreme Court of West Virginia's pronouncement in Jenkins to authorize the recovery of punitive damages in this action.
VII. The Defendant's Conduct Need Not Constitute A "General Business Practice" To Be Actionable Under W.Va.Code, § 33-11-4(3) or (5)
Erie contends that any recovery under W.Va.Code, § 33-11-4(3) or (5) must be predicated upon proof that the Defendant violated those subsections "with such frequency as to indicate a general business practice." Erie argues that the Plaintiff proved only a single violation of the Act and that a single violation cannot satisfy the requirement that the Defendant's conduct constitute a "general business practice."
Erie's argument stems from that portion of the Jenkins opinion wherein the court indicated that "it does seem clear that more than a single violation of W.Va.Code, § 33-11-4(9), must be shown in order to meet the statutory requirement of an indication of `a general business practice' ...." 280 S.E.2d at 259. The fallacy of Erie's argument is demonstrated by the above reproduced quotation itself. The court in Jenkins was discussing the "general business practice" requirement which is found only in subsection 4(9)the subsections involved here, 4(3) and 4(5), contain no such requirement. There is no indication whatsoever in either the Act or the Jenkins opinion that the general business practice requirement is applicable to any section of the Act other than the one in which the legislature found fit to include it. The Court, then, was correct in refusing to give Erie's proffered instruction which would have imported that requirement into subsections 4(3) and (5).

VIII. The Act Was Not Applied Retroactively

Erie's final argument is that, because a cause of action was not created under the Unfair Trade Practices Act until the West Virginia Supreme Court's decision in Jenkins in 1981, by allowing the Plaintiff to recover under that Act based upon Erie's conduct in 1979 amounts to giving full retroactive application to a new cause of action.
This argument requires only a cursory discussion. While the Court recognizes the caution which should be exercised before a novel cause of action is given full retroactive effect, Bradley v. Appalachian Power Co., 256 S.E.2d 879 (W.Va.1978), the chronology of this case obviates the need to even consider whether the cause of action relied upon here should be given retroactive effect. The cause of action upon which Plaintiff recovered was created in 1974, the effective date of the Unfair Trade Practices Act, although it was not judicially recognized until the Jenkins decision in 1981. The cause of action existed, and Erie had notice of the conduct prohibited by the Act, as of the effective date of the statute, which predated Erie's wrongful conduct by five years. Therefore, the present case presents no issue of retroactivity.

IX. Conclusion

For the foregoing reasons, the Court does hereby rule as follows:
1. Erie's motion for a judgment notwithstanding the verdict is denied;
2. Erie's motion for a new trial is denied; and
3. Erie's motion for a remittitur is denied.

*692 APPENDIX B

Betty J. MUTAFIS, Appellee,

v.

ERIE INSURANCE EXCHANGE, a Pennsylvania Corporation, Appellant,

and

Erie Insurance Company, a Pennsylvania Corporation, Defendant.

No. 83-1421.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1984.

Decided March 5, 1984.
Before WINTER, Chief Judge, and MURNAGHAN and SPROUSE, Circuit Judges.
HARRISON L. WINTER, Chief Judge:
Erie Insurance Exchange (Erie) appeals from a judgment entered against it in an action under West Virginia's Unfair Trade Practices Act. The judgment was entered in favor of Betty J. Mutafis, a former policyholder of Erie, on the verdict of the jury awarding Mutafis compensatory damages of $15,000 and punitive damages of $20,000. The case arose from an Erie employee's act of placing a memorandum in Erie's claim file stating that Mutafis was "associated with mafia very heavily." The district court denied Erie's post-trial motions to grant a new trial, to grant judgment n.o.v., and to grant a remittitur. Mutafis v. Erie Insurance Exchange, 561 F.Supp. 192 (N.D. W.Va.1983).
In this appeal Erie advances contentions that the statute does not apply to the facts established by the proof, that the statute does not permit a private cause of action, that, even if the statute does apply, the common law defense of qualified privilege may be invoked despite the apparently contrary ruling of the district court, that the statute as applied in this case violates Erie's first amendment rights, and that the statute if it permits recovery of punitive damages is unconstitutional as a violation of Erie's first amendment rights.[1] Erie's contentions about the meaning and effect of the statute, whether it may serve as the basis for a private cause of action and what defenses, if any, may be successfully pleaded to such a cause of action have not been the subject of adjudication by West Virginia's highest court. With regard to Erie's constitutionally-based contentions, we note that we should not decide constitutional issues unless they inescapably require decision. Erie's contentions based upon the federal constitution, however, depend in large part on the resolution of those issues of the meaning and application of the West Virginia statute that have not yet been the subject of definitive adjudication. Accordingly, we certify to the West Virginia Supreme Court of Appeals, pursuant to W.Va. Code Ann. §§ 51-1A-1 et seq. (1981 Replacement Vol.), the facts and questions which follow.

*693 I.
Plaintiff was a former policyholder of Erie. Her automobile was stolen in 1979, and three weeks later, the automobile of her cousin, Vincent J. Oliverio was also stolen. Plaintiff's loss was investigated by Erie's adjuster, Richard Kimble. After a relatively brief period of time, plaintiff's automobile was found stripped and burned, and shortly thereafter her loss was paid.
The loss of Oliverio's automobile was also investigated and adjusted by Kimble. Kimble received information from a third party as to the likely whereabouts of the Oliverio vehicle, and as a result payment to Oliverio was delayed. When Oliverio inquired about the delay, Kimble told him that a cousin of Oliverio insured by Erie also had had a car stolen and that Erie was now investigating "your involvement" in the thefts. It is not disputed that the cousin to whom reference was made in the conversation was the plaintiff. Subsequently, Oliverio's vehicle was found stripped and burned, and when no evidence could be developed involving Oliverio in the theft, his claim was paid.
Despite payment of his claim, Oliverio sued Erie for defamation and under West Virginia's "insulting words" statute, W.Va. Code Ann. § 55-7-2 (1981 Replacement Vol.). In the course of discovery in that lawsuit, Oliverio obtained access to a confidential memorandum prepared by Kimble's supervisor, Glenn W. Laque, which became the principal basis of plaintiff's claim. The memorandum, addressed to Leonard Chaffee of Erie's Home Office Audit Department, was a report of an aspect of Kimble's investigation of the Oliverio loss, and it contained this postscript:
Please reference for your information to file # W017415, this is a relative and associated with mafia very heavily, although may have NO connection whatever.
The file that was referred to in the postscript was the file on plaintiff's loss.
It is established for purposes of decision that any suggestion that plaintiff had any association with the Mafia is untrue.
After Laque prepared the memorandum, he placed it in a sealed, red, confidential envelope, enclosed the confidential envelope in another envelope, and mailed it from his office in Parkersburg, West Virginia to the head of Erie's audit department in Erie, Pennsylvania. Erie's audit department has responsibility for monitoring suspicious or fraudulent property losses. After receiving and reviewing the memorandum, the head of the audit department placed a copy in plaintiff's file.
As before stated, the existence of the memorandum was disclosed as a result of court-ordered discovery in Oliverio's suit against Erie. After plaintiff was advised of the existence of the memorandum, she sought, through counsel, an apology from Erie and a purging of any untrue statements from her file. Erie denied possession of any unfavorable statements about plaintiff. At some time after the Oliverio trial, Erie clipped and destroyed the postscript in the copy of the memorandum in plaintiff's file.
Plaintiff's suit against Erie alleged causes of action for slander, libel and insulting *694 words, but the district court granted directed verdicts on these counts, apparently on the basis that there had been no publication of the memorandum or at least no over-publication. In any event, plaintiff has not appealed from these rulings and their correctness is not before us.
Plaintiff alleged a fourth cause of actionwhether Erie's conduct constituted outrageous conduct involving an intentional infliction of severe emotional distress. The district court submitted this claim to the jury, which found for Erie. Plaintiff has not appealed from the judgment entered on this aspect of the jury's verdict so that once again, this issue is not part of this appeal.
Plaintiff's remaining causes of action were based upon two subsections of West Virginia's Unfair Trade Practices Act, W.Va.Code Ann. §§ 33-11-4(3) and (5) (1982 Replacement Vol.). Those subsections are:
§ 33-11-4. Unfair methods of competition and unfair or deceptive acts or practices defined.
The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:
. . . . .
(3) Defamation.No person shall make, publish, disseminate, or circulate, directly or indirectly, or aid, abet or encourage the making, publishing, disseminating or circulating of any oral or written statement or any pamphlet, circular, article or literature which is false, or maliciously critical of or derogatory to the financial condition of any person and which is calculated to injure such person.
. . . . .
(5) False statements and entries.(a) No person shall knowingly file with any supervisory or other public official, or knowingly make, publish, disseminate, circulate or deliver to any person, or place before the public, or knowingly cause directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false material statement of fact as to the financial condition of a person.
(b) No person shall knowingly make any false entry of a material fact in any book, report or statement of any person or knowingly omit to make a true entry of any material fact pertaining to the business of such person in any book, report or statement of such person.
The district court submitted these alleged causes of action to the jury on the evidence that the parties adduced. The jury returned a verdict for plaintiff for both compensatory and punitive damages. Post-trial motions were denied with the discussion and for the reasons set forth in Mutafis v. Erie Insurance Exchange, supra.

II.
On these facts, we perceive these undecided questions of West Virginia law which we certify to the West Virginia Supreme Court of Appeals:
1. If the facts stated in part I of this opinion are true, were the actions of Erie, its agents, servants and employees in violation of § 33-11-4(3) and (5), or either of them?
2. If question 1 is answered in the affirmative, does West Virginia law permit a private cause of action by plaintiff against Erie?[2]
*695 3. If questions 1 and 2 are answered in the affirmative, is the common law defense of qualified privilege an available defense to the action?
To afford counsel the opportunity to comment upon both our statement of the relevant facts and the proposed questions prior to certification and to suggest modifications thereto, the formal certification order will be stayed for fourteen days from the filing of this opinion. Any comments or suggestions filed by counsel within this period will be taken under advisement and the facts and questions will be modified as we deem proper. Our formal order of certification will provide that all fees and costs in the West Virginia Supreme Court of Appeals shall be equally divided among the parties.
AN ORDER WILL ISSUE.
NOTES
[1] This Court has diversity jurisdiction under the provisions of 28 U.S.C. § 1332. The Plaintiff is a resident of West Virginia; the Defendants are Pennsylvania corporations. The complaint asserted a colorable claim for an amount in excess of $10,000.
[2] W.Va.Code, § 55-7-2, discussed infra at page 197, note 7.
[3] W.Va.Code, § 33-11-1, et seq., discussed infra at Section III.
[4] The Court notes at the outset of this discussion that the falsity of this statement has never been questioned by Erie. The facts surrounding the placement of this memorandum into the Plaintiff's insurance file is more fully discussed infra at Section IV.
[5] In Parker v. Appalachian Electric Power Company, 126 W.Va. 666, 30 S.E.2d 1 (1944) the West Virginia Supreme Court of Appeals held that, "[w]hether a conditionally privileged occasion was exceeded is a question of law for the court or fact for the jury and depends upon the absence or existence of a controversy as to facts bearing thereon." Id. at 672; 30 S.E.2d at 4. This standard was also cited in England v. Daily Gazette Company, 143 W.Va. 700, 104 S.E.2d 306 (1958); City of Mullens v. Davidson, 133 W.Va. 557, 57 S.E.2d 1 (1949); Swearingen v. Parkersburg Sentinel Company, 125 W.Va. 731, 26 S.E.2d 209 (1943); Stewart v. Riley, 114 W.Va. 578, 172 S.E. 791 (1934); Higgins v. Williams Pocohontas Coal Company, 103 W.Va. 504, 138 S.E. 112 (1927).
[6] Communications between an employer and his employees usually fall within the conditional privilege. Mauck, 280 S.E.2d at 221, citing Parker v. Appalachian Electric Power Company, supra. "The qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter." Mauck, 280 S.E.2d at 221.

To determine whether one has exceeded the qualified privilege the Court must look to whether the publisher limited "the publication to the parties to whom he owes a duty or to parties who may be concerned with him in the protection of a legitimate interest." Porter v. Eyster, 294 F.2d 613 (4th Cir.1961) citing Barger v. Hood, 87 W.Va. 78, 104 S.E. 280 (1920); Rigney v. W.R. Kreese & Co., 104 W.Va. 168, 139 S.E. 650 (1927); Stewart v. Riley, 114 W.Va. 578, 172 S.E. 791 (1934); Swearingen v. Parkersburg Sentinel Company, 125 W.Va. 731, 26 S.E.2d 209 (1943); England v. Daily Gazette Company, 143 W.Va. 700, 104 S.E.2d 306 (1958). See also Mauck v. City of Martinsburg, 280 S.E.2d at 221 (quoting the same language from the Fourth Circuit's opinion in Porter).
The testimony presented at trial was bereft of any indication that the memorandum was published to anyone not having a legitimate interest in the information contained therein. The only extra-corporate publication was made pursuant to discovery proceedings in the case of Vincent Oliverio v. Erie Insurance Exchange, Civil Action No. 79-C-856-2, which was pending in the Circuit Court of Harrison County. That action was based on false statements made by employees of Erie Insurance Exchange linking Oliverio with the Mafia. Oliverio's counsel, the same counsel representing the Plaintiff at bar, obtained through the appropriate provisions of the West Virginia Rules of Civil Procedure, a copy of Oliverio's claim file. That file contained a reference to an unnamed relative of Oliverio's identified only by claim number, who was allegedly "heavily involved in the Mafia". Oliverio's counsel, again through the use of the Rules of Civil Procedure, obtained the relative's file, which subsequent developments revealed to be that of the Plaintiff.
During the course of the Oliverio trial the Clarksburg papers carried stories on the proceedings, including the following report which appeared in the morning edition of the local newspaper, The Clarksburg Exponent, on Saturday, March 28, 1981:
"After the suit was filed and the records were released, Oliverio and his attorney, David Romano, found a paper there indicating that one of his relatives, whose name was not revealed, was heavily associated with the Mafia."
[An identical news account of the Oliverio trial was carried in the evening edition of the local paper, The Clarksburg Telegram.] After his trial had concluded, Oliverio discussed the trial and the newspaper accounts with the Plaintiff and confirmed her suspicion that it was her file which was referred to in the news accounts.
Even though the release of the file to Oliverio's counsel constituted an extra-corporate publication, the Court ruled that this could not be considered an abuse of the qualified privilege because this communication was incident to a judicial proceeding and was, therefore, absolutely privileged. See Parker v. Appalachian Electric Power Co., 126 W.Va. 666, 30 S.E.2d 1 (1934); Higgins v. Williams Pocohontas Coal Co., 103 W.Va. 504, 138 S.E. 112 (1927); Ward v. Ward, 47 W.Va. 766, 35 S.E. 873 (1900).
[7] At the conclusion of all the evidence the Court also granted Erie's motion for a directed verdict on the Plaintiff's cause of action under the Insulting Words Statute, W.Va.Code, § 55-7-2. Because the Court had ruled that there was no publication to a third party, any recovery by the Plaintiff under the insulting words statute would have to have arisen from a communication of the insulting statement to the victim of the insult, the Plaintiff, alone. Mauck v. City of Martinsburg, 280 S.E.2d 216, 218 (W.Va.1981). As the evidence presented at trial and the deposition testimony of the Plaintiff reproduced below indicates, the insult was never directly communicated to the Plaintiff:

"Q. Have you ever seen such a document or memo [referring to the August 7, 1979, memorandum]?
A. No, I haven't.
Q. Prior to the newspaper account, had you ever received any information that indicated to you that there existed anything in your insurance records with Erie that used your name in connection with the Mafia?
A. No.
Q. Would it be a fair statement to say that by reason of the newspaper account, you had suspicions that you were the cousin to which reference was made?
A. Yes.
Q. And then Mr. Oliverio confirmed those suspicions when had his conversation with you after his trial?
A. Yes."
The lack of a direct communication of the offensive statement to the Plaintiff or to a third party prevented the Plaintiff from establishing a viable cause of action under the Insulting Words Statute. Therefore, the Court dismissed this count of the complaint.
[8] First National Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) involved a Massachusetts statute prohibiting corporations from making expenditures or contributions "for the purpose of ... influencing or affecting the vote on any question submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation." Id. at 768, 98 S.Ct. at 1411. The statute also contained a provision absolutely barring corporate expenditures on ballot issues relating solely to individual taxation. Id. The Court found the statute to be "an impermissible legislative prohibition of speech based on the identity of the interest that spokesmen may represent in public debate over controversial issues and the requirement that the speaker have a sufficiently great interest in the subject to justify communication." 435 U.S. at 784, 98 S.Ct. at 1420 (emphasis added).

In Virginia Board of Pharmacy v. Virginia Consumer Council, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) the Court considered the constitutionality of a Virginia statute which provided that a pharmacist is guilty of unprofessional conduct if he advertises the price of prescription drugs. Id. at 749-50, 96 S.Ct. at 1819-20. In striking down the statute using a First Amendment analysis the Court stated that: "[i]t is a matter of public interest that those decisions, [concerning the proper allocation of resources in a free enterprise economy] in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable." Id. at 765, 96 S.Ct. at 1827 (emphasis added).
Another Virginia statute was at issue in Bigelow v. Virginia, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). Bigelow, an editor of a newspaper, was tried and convicted of violating a Virginia statute making it a misdemeanor for any person to encourage or prompt, by the sale or circulation of any publication, the procuring of an abortion. Id. at 812-13, 95 S.Ct. at 2227-28. The newspaper of which Bigelow was the managing editor ran an advertisement informing readers of the availability of legal abortions in New York. The advertisement also contained the address and telephone number of an agency which would assist interested persons in making the necessary arrangements. 421 U.S. at 812, 95 S.Ct. at 2227. The Court reversed Bigelow's conviction after concluding that the advertisement was protected speech under the First Amendment. Viewing the advertisement in its entirety the Court found that it "conveyed information of a potential interest and value to a diverse audiencenot only to readers possibly in need of the services offered, but also to those with a general curiosity about, or genuine interest in, the subject matter or the law of another State and its development, and to readers seeking reform in Virginia." 421 U.S. at 822, 95 S.Ct. at 2232.
The last case cited by Erie is Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). There the Supreme Court addressed a regulation of the Supreme Court of Arizona which restricted advertising by attorneys. Perceiving that the advertising ban, like the Virginia statute challenged in Virginia Board of Pharmacy, served "to inhibit the free flow of commercial information and to keep the public in ignorance", the Court held the disciplinary rule to be violative of the First Amendment. Id. at 384, 97 S.Ct. at 2709 (emphasis added).
[9] In addition to the factors previously discussed in the text which distinguish the First Amendment cases relied upon by Erie, in discussing New York Times v. Sullivan, this Court is constrained to further point out that Sullivan involved two important elements not present in this casea media defendant and a plaintiff who was a public official. This distinction is noteworthy since the Supreme Court wished to avoid "self-censorship" by the press and considered the issues in Sullivan "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. at 270, 84 S.Ct. at 720.
[10] In making determinations of state law in diversity cases under the doctrine of Erie Railway Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) where there is no controlling state precedent, a federal court must look to the probable analysis the forum state's highest court would employ. Patrick v. Sharon Steel Corporation, 549 F.Supp. 1259 (N.D.W.Va.1982); Pauley v. Combustion Engineering, Inc., 528 F.Supp. 759 (S.D.W.Va.1981).
[11] Syllabus point 1 of the Hurley opinion summarized the analysis to be used.

"The following is the appropriate test to determine when a State statute gives rise by implication to a private cause of action: (1) the plaintiff must be a member of the class for whose benefit the statute was enacted; (2) consideration must be given to legislative intent, express or implied, to determine whether a private cause of action was intended; (3) an analysis must be made of whether a private cause of action is consistent with the underlying purposes of the legislative scheme; and (4) such private cause of action must not intrude into an area delegated exclusively to the federal government."
[12] See e.g. the court's statement that ["t]here can be little question in reviewing the entire Act that it is not limited to activities between the insured and the insurance company. 280 S.E.2d at 255.
[13] This section, W.Va.Code, § 33-11-6, is discussed in Section VI of this opinion. See footnote 18 and accompanying text.
[14] See 15 U.S.C. § 1011, which provides:

"The Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several states."
See also W.Va.Code, § 33-11-1.
[15] The jury was instructed that:

"In order to recover punitive damages, the Plaintiff must prove by a preponderance of the evidence that the Defendant acted in an intentional manner, meaning an intent to harm someone, or with a recklessness demonstrating disregard for another person's rights and the Defendant must also have acted willfully."
This was a correct statement of West Virginia law. See Wells v. Smith, 297 S.E.2d 872 (W.Va.1982); Bond v. City of Huntington, 276 S.E.2d 539 (W.Va.1981).
[16] When ruling on a motion for judgment notwithstanding the verdict, the only issue for the Court to decide is whether, giving the non-moving party the benefit of every legitimate inference, there was evidence upon which the jury could reasonably return a verdict for the prevailing party. Mays v. Pioneer Lumber Corporation, 502 F.2d 106 (4th Cir.1974).
[17] The court in Harless borrowed the definition of "emotional distress" found in Section 46(j) of the Restatement (Second) of Torts, which states that:

"The term `emotional distress' passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea." See 289 S.E.2d at 704 n. 20.
[18] W.Va.Code, § 33-11-6 authorizes the commissioner to impose the following sanctions:

"(a) Require the payment to the State of West Virginia a penalty in a sum not exceeding $1,000 for each and every act or violation, but not to exceed an aggregate penalty of $10,000, unless the person knew or reasonably should have known he was in violation of this article, in which case the penalty shall be not more than $5,000 for each and every act or violation, but not to exceed an aggregate penalty of $50,000 in any six-month period.
(b) Revoke or suspend the license of such person if he knew or reasonably should have known that he was in violation of this article."
[1] An aspect of Erie's contentions is that, because the West Virginia Supreme Court of Appeals had not acted to create a private cause of action in an even vaguely analogous situation prior to the conduct which is the basis of this suit, if an implied statutory cause of action were to be permitted in the present case, the effect would be to give the cause of action retroactive application. We disagree. The statute in which the district court found a private cause of action implied was enacted in 1974 and thus was effective prior to Erie's acts. See 1974 W.Va. Acts, c. 51. Erie thus had notice of the conduct prohibited by the statute well before its acts that are the basis of the present action.
[2] We are, of course, aware of Jenkins v. J.C. Penney Casualty Insurance Co., 280 S.E.2d 252 (W.Va.1981), which held that a private cause of action will lie for a violation of § 33-11-4(9). The West Virginia Supreme Court of Appeals has not spoken, however, with respect to § 33-11-4(3) or (5).